TUTTLE, Circuit Judge:
 

 Robert Cohn was a dutiful son. Upon graduation from college in approximately 1968, he took over the operation of a family business, a group of three McDonald’s restaurants established by his mother in the early 1960’s. The business flourished for several years under Robert Cohn’s leadership. By the mid-1970’s, the family, through closely-held corporations, owned ten restaurants, and in October 1977, Robert Cohn, and his associate Gary Mudge, sold substantially all of the stock in the corporations holding the restaurants to the McDonald’s Corporation and netted just under one million dollars.
 

 This family success story is marred by the bad fortunes of Robert’s parents, Harry and Pauline Cohn, and his brother, Larry Cohn. These members of the Cohn family suffered severe financial reversals. The reversals resulted in their petitions for voluntary bankruptcy in February 1978.
 

 Robert Cohn stood by his family in hard times. Rather than allow family assets to fall into the hands of outsiders, shortly before the filing of the bankruptcy petitions,
 
 *1149
 
 he participated in several transactions that resulted in his possession of assets that would otherwise have been received by the trustee in bankruptcy, Charles Gower. These assets include: 1) stock owned by Pauline, and Larry Cohn in the family corporations that operated three McDonald’s restaurants; 2) real estate owned by Harry Cohn; and 3) $20,000 cash.
 

 Mr. Gower, as trustee, resented this family-spirited action by the Cohns and filed this lawsuit against Robert Cohn in the district court for return of the value of the assets to the bankrupts’ estates. In so doing, he sought to reach the assets by various means. He used some traditional weapons of a trustee, in addition to an antifraud claim under the federal securities laws. Following a trial, the jury awarded the trustee $247,000 in general damages and $10,000 in punitive damages for Robert Cohn’s tortious acts.
 

 Robert Cohn appeals these awards on numerous grounds. Following a review of Cohn’s claims, we affirm the jury’s awards.
 

 I.
 
 The Assets
 

 In March 1976, the Cohns began the string of transactions that were challenged in the trial court. On March 11, 1976, Larry Cohn borrowed $247,144.72 from the Columbus Bank and Trust Company to aid his haberdashery business. His parents also signed the note.
 

 Part of the collateral for the loan was stock. Pauline Cohn held stock in three corporations that separately owned three McDonald’s restaurants. She owned sixty of ninety-nine shares in both PLB Corporation and PLB Enterprises, Inc. She also owned eight of ninety-nine shares in CC & M, Inc.
 
 [1]
 
 The shares held by Pauline Cohn in PLB Corporation were pledged as collateral for the loan.
 
 [2]
 

 At the time of the making of the loan, Pauline Cohn valued all her stock in the three corporations at $200,000.
 
 [3]
 
 She so stated on financial statements dated February 20, 1976 and December 1, 1976. This statement was relied on by the bank that made the loan to Larry Cohn.
 
 [4]
 
 Both Pauline and Harry Cohn reaffirmed that $200,-000 was the value they consistently attached to their stock. They placed this value on the stock, because it produced an income stream of approximately $12,000 per year.
 

 From this rather innocent beginning, the Cohns’ actions took a more deceitful turn.' On March 13, 1976, the stock of two of the corporations was significantly diluted. The PLB Corporation and PLB Enterprises, Inc. each issued 46 shares to Gary Mudge and 135 shares to Robert Cohn. This issuance more than doubled the number of shares outstanding in these corporations.
 
 [5]
 

 
 *1150
 
 Subsequently, PLB Corporation and PLB Enterprises each issued an additional 24,954 shares to Gary Mudge and 74,865 shares to Robert Cohn. In addition, CC & M, Inc. issued 25,000 shares to Gary Mudge and 75,000 shares to Robert Cohn.
 
 [6]
 
 The date of issuance of these shares is uncertain. Robert Cohn shows by his family’s corporate records that the shares were issued on June 21,1976. Gower, plaintiff-trustee, contends that the shares were issued later. On this point, Gower offered certificates, filed by Cohn with the Georgia Secretary of State, attesting that as of March 18, 1977, PLB Corporation and PLB Enterprises had only 280 shares of issued stock while CC & M, Inc. had only 99 shares of issued stock.
 

 The next significant event occurred in September, 1976. Harry Cohn borrowed $20,000 from the First National Bank in Columbus.
 
 [7]
 
 Three days later on September 27, he wrote a personal check for $20,000 to Robert Cohn. There was no evidence that Robert Cohn gave Harry Cohn anything in exchange for the $20,000. Robert Cohn testified that the $20,000 was passed on to his brother as a loan from Harry to Larry.
 

 The factual climax of the case transpired in July, 1977. In that month, Larry, Harry, and Pauline Cohn conveyed securities and real estate to Robert Cohn allegedly for less than those assets’ respective values.
 

 The real estate consisted of one-half interest in two buildings in Columbus, Georgia. This real estate Harry Cohn valued at $65,000 on February 20,1976 and December 1, 1976. On July 1, 1977, Harry Cohn sold this real estate to Robert Cohn who gave as consideration a note for $40,000. Harry Cohn testified that Robert gave additional consideration because in the previous year, Robert had assumed payments on two loans totalling $17,000 owed to the First National Bank of Columbus.
 

 The Cohns’ securities in the corporations operating the three restaurants were at one time valued at over $200,000. Pauline Cohn in July conveyed her securities to Robert Cohn for approximately four hundred dollars. Larry Cohn’s interest was also transferred to Robert for approximately one hundred and fifty dollars.
 

 In February 1978, Pauline, Harry, and Larry Cohn filed petitions for voluntary bankruptcy. In response Gower as trustee, brought this suit to preserve the bankrupts’ estates. The jury agreed with Gower on all counts relating to the propriety of his recovery and awarded him $247,000 general damages without apportioning the damages to any specific count. On this appeal, Robert Cohn points to numerous alleged eviden-tiary deficiencies in plaintiff’s case. He claims the district court erred in refusing to direct a verdict or grant a judgment n.o.v. on those points. In reviewing Cohn’s claims, we generally apply the substantial evidence rule, granting all reasonable inferences to non-movant Gower.
 
 See Boeing Co. v. Shipman,
 
 411 F.2d 365 (5th Cir. 1969) (en banc).
 

 A.
 
 The Securities
 

 The securities have the largest value of any of the disputed assets. Gower sought ■to reach the value of the securities by two means. Although neither party mentions the point, Gower claimed at trial that the transfer of the securities was fraudulent and the court so instructed the jury in the fraudulent conveyance portion of the charge. The jury verdict specified that the trustee prevailed upon the fraudulent transfer counts. In an alternative approach, Gower also alleged that the dilution
 
 *1151
 
 of the stock and the subsequent sale of the original securities from Pauline and Larry Cohn to Robert Cohn violated rule 10b-5 promulgated under the Securities Exchange Act of 1934. Under the 10b-5 claim, he alleged that Robert Cohn defrauded his mother and brother. As trustee, Gower sought to recover under the federal securities laws as Pauline and Larry Cohn could have recovered, had they not filed for bankruptcy. Robert Cohn does not specifically question the district court’s handling of the fraudulent transfer claim but he contends that the 10b-5 count, upon which the jury also specified a finding for the plaintiff, should never have been so submitted.
 

 1.
 
 Use of Instrumentality of Interstate Commerce
 

 First, Robert Cohn claims that Gower failed to prove the use of an instrumentality of interstate commerce, a jurisdictional prerequisite to recovery under the federal securities laws.
 
 See generally
 
 15 U.S.C. § 78j; rule 10b-5, 17 C.F.R. § 240.10b-5. This Court, in the case both parties agree controls this case, held that “any use of instrumentalities of ... interstate facilities ... constituting an important step in the execution of the fraudulent, deceitful scheme or in its consummation is sufficient” to create jurisdiction in the district where the use occurred.
 
 Hooper v. Mountain States Securities Corp.,
 
 282 F.2d 195, 204-05 (5th Cir. 1960). Cohn claims his motion for directed verdict should have been granted because Gower introduced no evidence that an instrumentality of commerce was used as an important step in the alleged fraudulent scheme. Even though he did not question the sufficiency of the evidence on this point in his directed verdict motion Cohn asks this Court now to review on this basis the trial court’s denial of his motion for a directed verdict. Cohn’s failure to raise this issue at trial limits this Court’s review to whether Gower produced
 
 any
 
 evidence on this issue rather than whether he produced sufficient evidence.
 
 See House of Koscot Development Corp. v. American Line Cosmetics,
 
 468 F.2d 64, 68 & nn. 4, 5 (5th Cir. 1972).
 

 The defendant, without question, placed an intrastate telephone call that was received by his mother, and he admits that an intrastate call can suffice.
 
 See Alley v. Miramon,
 
 614 F.2d 1372, 1379 (5th Cir. 1980);
 
 Dupuy v. Dupuy,
 
 511 F.2d 641, 643-44 (5th Cir. 1975). Cohn’s sole argument is that under
 
 Hooper
 
 the one intrastate telephone call was not sufficiently important to this scheme. In support of his argument that the one telephone call was not sufficient, Cohn notes that the Court of Appeals for the Ninth Circuit in one case has held that two local calls were not sufficient to meet the jurisdictional means requirements of the securities laws.
 
 See Burke v. Triple A Machine Shop, Inc.,
 
 438 F.2d 978 (9th Cir. 1971) (per curiam).
 

 Cohn is clearly wrong in arguing that intrastate calls should receive treatment different from that accorded interstate calls. The
 
 Burke
 
 court did not hold that intrastate calls have little or no weight in the jurisdictional formula. Rather, as the Ninth Circuit has stated:
 

 [A]ll
 
 Burke
 
 stands for is the proposition that the jurisdictional requirement of the Securities and Exchange Act of 1934 is not satisfied where the use of “any means or instrumentality of interstate commerce or the mails” is not connected to the transaction in question.
 

 Spilker v. Shayne Laboratories, Inc.,
 
 520 F.2d 523, 525 (9th Cir. 1975). Thus, the only question is whether there was evidence that the one call in this case was important to Cohn’s scheme.
 

 The facts clearly reveal the call’s importance to the scheme. In July, 1977, Robert Cohn telephoned his mother, Pauline Cohn, who was in Columbus, Georgia. He then told her that he was sending a lawyer to Columbus and the lawyer would bring papers for her to sign. He told her that he wanted her and Larry to sign the papers. The papers signed on or about July 6, 1977, without question, included papers regarding the sale of all shares, in the three corporations, held by Pauline and Larry Cohn. Gower further contends that the papers
 
 *1152
 
 also included papers authorizing the large issuance of additional shares in each of the three corporations to Robert Cohn and Gary Mudge. Cohn denies that the papers included this authorization to issue additional shares.
 

 If the papers only included the papers regarding the transfer of shares from Pauline and Larry Cohn to Robert Cohn, the telephone call was nevertheless an important step in the consummation of the allegedly fraudulent scheme.
 
 [8]
 
 Regardless of whether the deception occurred at the sale, or at the possibly prior issuances of stock, the telephone call was still an important step in the overall scheme, because Robert Cohn still needed to purchase the shares held by his brother and mother in order to complete his scheme. The ultimate goal of his plan was to sell the three restaurants to McDonald’s. McDonald’s wanted all the shares apparently in order to acquire total control and to avoid trouble with minority shareholders.
 
 [9]
 
 He could not have completed this plan and reaped the benefits of his alleged deception without obtaining all shares in the corporations that owned the restaurants. The telephone call was thus an indispensable part of Cohn’s scheme.
 

 Gower, thus, offered evidence toward satisfaction of the jurisdictional means requirement of the securities laws. If the stock had already been diluted at the time of the telephone call, Robert Cohn would not have deceived Pauline and Larry at that point because he would be taking their stock for approximately its fair value. But the securities laws do not require that the deception occur in the use of facilities interstate commerce.
 
 See Hooper v. Mountain States Securities Corp.,
 
 282 F.2d 195, 204 & n. 12 (5th Cir. 1960);
 
 Errion v. Connell,
 
 236 F.2d 447, 455 (9th Cir. 1956). The telephone call must only be made in connection with a fraudulent scheme. Although a use of interstate commerce facilities totally unrelated to the defendant and the transaction would not support jurisdiction,
 
 see Boone v. Baugh,
 
 308 F.2d 711, 713-14 (8th Cir. 1962);
 
 Ford v. Cannon,
 
 413 F.Supp. 1393, 1397 (M.D.Fla.1976), the “subsequent use of interstate facilities in furthering the scheme is sufficient to establish federal jurisdiction.”
 
 Myzel v. Fields,
 
 386 F.2d 718, 728 (8th Cir. 1967). The telephone call in this case clearly furthered Robert Cohn’s overall scheme and as such it fell within the jurisdictional means requirement as articulated by this Court because it was of “material importance to the consummation of the scheme.”
 
 Hooper v. Mountain States Securities Corp.,
 
 282 F.2d 198, 205 (5th Cir. 1960).
 

 2.
 
 Failure to Disclose Information
 

 Cut off on his jurisdictional argument, Robert Cohn heads for his next line of defense. He notes that rule 10b-5 requires that the plaintiff demonstrate that the defendant failed to disclose information material to the various transactions.
 
 See SEC v. Shapiro,
 
 494 F.2d 1301, 1305-06 (2d Cir. 1974). He then argues that Gower as plaintiff had failed to carry his burden because all persons involved in the transaction testified that they knew the relevant facts.
 

 
 *1153
 
 Unfortunately for Robert Cohn, the issue does not turn on whether his witnesses gave testimony favorable to him on this issue. Instead, this issue turns on whether the plaintiff, Gower, has introduced substantial evidence showing that Pauline and Larry Cohn did not know the relevant facts because of Robert Cohn’s failure to disclose. Because Gower alternatively claimed that Cohn employed deception on the issuances of shares and in the sale of securities, he must have shown evidence that there was a lack of knowledge in each transaction. The record reveals that substantial evidence for the plaintiff on this issue was introduced at trial and the defendant was not entitled to a directed verdict on this ground.
 

 There was evidence that Pauline Cohn did not know that she had signed papers authorizing the issuance of a large number of shares in each of the three corporations. At trial, Pauline Cohn testified that Robert Cohn had kept her informed of the business’ activities and she knew of the issuance of additional shares, but there was also evidence that she had no knowledge that thousands of additional shares had been issued in two stages, in March and June, 1976, to Robert Cohn and Gary Mudge. She stated that she signed the papers authorizing the issuance of additional shares but claims that she did not read them.
 
 [10]
 
 These facts constituted her explanation of her prior statement that she had never seen those papers and did not know of the several issuances. We think that this explanation constituted evidence showing that Robert had secured the issuances without Pauline’s knowledge. Moreover, Pauline Cohn’s adherence to the same valuation of the stock after the dilution allegedly occurred in March and June of 1976 could also be interpreted as indicating her lack of knowledge of the issuanc-es.
 
 [11]
 

 
 *1154
 
 In addition, there was evidence presented at trial showing that Pauline Cohn acted without knowledge of relevant facts when she signed papers agreeing to sell her stock in July, 1977. Robert Cohn had set up this transaction when he telephoned his mother. He told her that he was sending to Columbus a lawyer who would bring some papers that he wanted her to sign.
 
 [12]
 
 When the lawyer came with the papers, Pauline Cohn testified that she did not even read the papers because she trusted her son and he always fairly informed her of the business’ activities.
 
 [13]
 
 Pauline Cohn did not question
 
 *1155
 
 the lawyer about the papers but merely asked where to sign.
 
 [14]
 
 Although Pauline Cohn states that Robert Cohn kept her informed on business matters and told her he was planning to sell the business, there was evidence that she did not know before she signed the agreement that he was buying her interest in the restaurants for only a few hundred dollars,
 
 [15]
 
 when she valued that interest at $200,000 at that time.
 
 [16]
 

 From this evidence the jury might have properly concluded that at either or both the issuances of stock and the transfer of stock, Pauline Cohn did not know relevant information.
 
 [17]
 
 Under these circumstances the district court’s refusal to direct a ver-
 
 *1156
 
 diet for the defendant on this ground must be affirmed.
 
 [18]
 

 3.
 
 Due Diligence
 

 Cohn next contends that he was entitled to a directed verdict because Pauline and Larry Cohn did not exercise due diligence to discover the information that Robert Cohn failed to disclose. He argues that a 10b-5 plaintiff must exercise due diligence to discover undisclosed information. Cohn concludes that Gower, who represents the positions that Pauline and Larry Cohn would take as plaintiffs, did not demonstrate that Pauline and Larry Cohn exercised due diligence because they failed to read the documents authorizing the actions that allegedly defrauded them.
 

 Before recovery on behalf of a victim may be had under rule 10b-5, there must be evidence of some degree of “due diligence.” This Court has held that the inquiry should focus on whether the victim “intentionally refused to investigate ‘in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.’ ”
 
 Dupuy v. Dupuy,
 
 551 F.2d 1005, 1020 (5th Cir. 1977) (quoting W. Prosser, Torts § 34, at 185 (4th ed. 1971)). In answering the appellant’s claims, this Court is guided by the “recklessness” standard set forth in
 
 Dupuy.
 

 Under that recklessness standard, we hold that this question was properly presented to the jury. Pauline and Larry Cohn were not any longer intimately involved with these corporations when the alleged deception occurred. Each testified that Robert Cohn was the person who was managing the businesses. Each felt that he or she was fairly informed about the business. Thus, they saw no need to read the various documents dealing with the business. Moreover, each testified that other concerns prevented their close attention to the signing of business papers: Pauline noted several family problems and Larry was pressed by other business concerns. They trusted Robert, who was son to Pauline and brother to Larry. And as discussed above, there was evidence that this trust was misplaced because there was evidence that Robert Cohn through the use of this trust secured authorizations for issuances of stock and transfer of stock without informing his mother and brother. Ordinarily a person who signs a simple document may not be defrauded simply because he failed to read the document. Under the facts of this case, however, the “victims” might have been deceived by the defendant who, by at least some of the evidence, procured the necessary signatures by a fraud drawing upon the trust reposed in him. Whether, given this trick employed by defendant, the “victims,” close relatives of the alleged deceiver, acted recklessly, in signing papers about which they had no reason for suspicion, was a question for the jury. And the defendant’s motion for directed verdict on this ground was properly denied.
 

 4.
 
 Reliance
 

 Robert Cohn next argues that the plaintiff failed to allege and prove that the “victims” would not have acted as they did, had they known the information which was withheld by the defendant. He perceives this “reliance” to be an element of the plaintiff’s case.
 

 Analysis of this issue logically begins with
 
 Affiliated Ute Citizens v. United
 
 
 *1157
 

 States,
 
 406 . U.S. 128, 92 S.Ct. 1456, 81 L.Ed.2d 741 (1972). In that case, the Supreme Court stated that:
 

 Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. .. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.
 

 Id.
 
 at 158-54, 92 S.Ct. at 1472 (citations omitted). By this language, the Supreme Court clearly set omission cases, such as this case, apart from cases involving affirmative misrepresentation.
 

 One might naturally read
 
 Affiliated Ute
 
 as holding that evidence of reliance is not relevant in omission cases. But
 
 Ute
 
 is not always read so broadly. One plaintiff’s argument to that effect was rejected by this Court in
 
 Simon v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,
 
 482 F.2d 880 (5th Cir. 1973). The
 
 Simon
 
 Court held that a “victim” cannot recover under rule 10b-5 if there was a “general lack of reliance” on any of the defendant’s representations.
 
 Id.
 
 at 884-85. In an explanation of
 
 Simon,
 
 this Court has referred to the
 
 Ute
 
 concept of reliance as a “presumption of reliance.”
 
 Rifkin
 
 v.
 
 Crow,
 
 574 F.2d 256, 262 (5th Cir. 1978). The
 
 Rifkin
 
 Court then discussed the allocation of burdens of proof under
 
 Ute
 
 and
 
 Simon,
 
 concluding that:
 

 [wjhere a plaintiff alleges deception by defendant’s nondisclosure of material information, the
 
 Ute
 
 presumption obviates the need for plaintiff to prove actual reliance on the omitted information. Upon a failure of proof on the issue, defendant losses. But this presumption of reliance in nondisclosure cases is not conclusive. If defendant can prove that plaintiff did not rely, that is, that plaintiff’s decision would not have been affected even if defendant had disclosed the omitted facts, then plaintiff’s recovery is barred.
 

 Id.
 
 (footnotes omitted). This discussion by the
 
 Rifkin
 
 Court means, in a nutshell, that the defendant bears the burden of proof on the element of reliance in omission cases.
 
 [19]
 
 Defendant Cohn, thus, bore the burden to show that the victims did not rely on the representations or omissions by the defendant.
 
 [20]
 

 Given this allocation of the burden of proof, Robert Cohn was not entitled to a directed verdict on this reliance issue. He claims that the trustee-plaintiff introduced no evidence showing that Pauline and Larry Cohn would have acted differently if they had the omitted information. This argument misses the mark because it was the defendant’s obligation to introduce evidence to the contrary. We are aware that Pauline and Larry Cohn, at various points in their testimony, stated that they wanted no part of the stock and Robert Cohn could have it all. If believed, that testimony would indicate that the omission did not
 
 *1158
 
 cause Pauline and Larry to act differently. But the jury’s verdict necessarily incorporates a finding of fact against Robert Cohn on this issue, and this Court does not believe that such testimony as was received at the trial sufficed to prove the issue in Cohn’s favor as a matter of law. This conclusion draws additional strength from the very thorough impeachment of Pauline and Larry Cohn by plaintiff-Gower. The district court did not err in allowing this issue to go to the jury.
 

 5.
 
 Securities
 
 — Conclusion
 

 We, of course, realize the seeming anomaly of a rule 10b-5 claim brought on behalf of a bankrupt whose interests are arguably aligned with, rather than against, the interests of the alleged deceiver. We seek only to answer the claims of error raised by appellant. In reviewing the proof concerning the four discrete elements questioned by the defendant-appellant we find that sufficient evidence existed to create a fact question for the jury on these elements. This Court need not raise
 
 sua sponte
 
 other possible errors in allowing, under the facts of this case, a rule 10b-5 recovery on behalf of Pauline and Larry Cohn.
 

 B.
 
 Real Property
 

 Robert Cohn contests whether the plaintiff proved that Harry Cohn’s sale of certain real property constituted a fraudulent transfer under section 67(d)(2) of the former Bankruptcy Act applicable to this case, former 11 U.S.C.A. § 107(d)(2) (West 1953). On July 1, 1977, Harry Cohn sold the real estate to Robert Cohn. Robert Cohn contends that he deserved a directed verdict on this issue because the plaintiff failed to introduce evidence on two elements of the cause of action.
 

 1.
 
 Insolvency
 

 Cohn contends that Gower introduced no evidence that Harry Cohn was insolvent when the real estate was sold on July 1, 1977. The Bankruptcy Act in a section relied upon by the plaintiff, provides that a transfer may be fraudulent if the debtor either “is or will be thereby rendered insolvent,” by the transfer. 11 U.S.C.A. § 107(d)(2)(a) (West 1953). A person is insolvent “when the present fair salable value of his property is less than the amount required to pay his debts.”
 
 Id.
 
 § 107(d)(1)(d). Cohn’s sole argument turns on his construction of the word “debts.” He contends that there is no evidence that Harry’s “debts” exceeded his assets because the notes Harry signed as guarantor should not be considered as his “debts.” He views as dispositive the Georgia law which he contends holds that “a guarantor cannot be liable until the principal has failed to pay.” His primary argument must be that Harry Cohn was not liable on the $247,000 note originally guaranteed in March, 1976 because that liability by itself far overshadows the value of Harry’s unencumbered assets according to a list of such assets in the letter from Harry’s attorney.
 

 This argument is not completely without force if it correctly interprets state law.
 
 [21]
 
 If state law holds that a person is not under any circumstances liable on a note, the note may not fairly be counted as one of his “debts” for purposes of the federal law of fraudulent conveyances. But the defendant is wrong to conclude that there is no debt under federal law simply because a Georgia guarantor’s liability is contingent upon the principal’s failure to pay. The provisions in section 67(d) are broader than the general definitions of insolvency and debt in section 1(14), (19).
 
 See Inland Security Co. v. Estate of Kirschner,
 
 382 F.Supp. 338, 344 (W.D.Mo.1974); 4
 
 Collier
 
 
 *1159
 

 on Bankruptcy,
 
 ¶ 67.32, at 499 & n.6 (14th ed. 1978). The specific definition of debt is one example as the fraudulent conveyance section of the federal Bankruptcy Act provides that: “ ‘debt’ is any legal liability whether material or immaterial, liquidated or unliquidated,
 
 absolute, fixed, or contingent.’’ 11
 
 U.S.C.A. § 107(d)(1)(b) (West 1953) (emphasis added). The terms of the Act control whether Harry Cohn’s liability on the note should be considered as his debts. The evidence clearly indicates that Harry Cohn could have been insolvent in July. A letter from Larry and Harry’s lawyer to Columbus Bank and Trust, dated September 15, 1977, admits that Harry Cohn was insolvent a short two months after the sale of real estate and offers the Bank a “deal” to partially salvage the Cohns’ obligation to the Bank. Harry Cohn admitted at trial that in August 1977, his lawyers told the Bank that Larry’s haberdashery was failing and when the haberdashery failed, he would become liable on the note that he guaranteed for the haberdashery. The letter stated that: “the Cohns have .. . liabilities far exceeding assets.” Although we need not decide whether this evidence constitutes an admission of insolvency on July 1, 1977, we do believe that it constitutes evidence creating fact questions regarding whether by July 1, 1977, Larry Cohn and the haberdashery were becoming unable to pay on the note and whether Harry Cohn’s liability in question was at least contingent, making it fairly one of his debts and thereby causing his liabilities to exceed his assets. Under these circumstances the district court correctly submitted the insolvency issue to the jury.
 

 2.
 
 Lack of Fair Consideration
 

 Cohn next argues that there was no proof of lack of fair consideration given for the real estate, another element that Gower admits is necessary to support a claim of fraudulent conveyance.
 
 See
 
 11 U.S.C.A. § 107(d)(1)(e), (d)(2) (West 1953). Dealing solely with the relative equivalence of the value received with the value given, Cohn contends that there was fair consideration because the property valued at $65,000 was sold for $57,000. He gave a $40,000 note at that time and claims that additional consideration was given because, in the previous year, he assumed payment on two of Harry’s notes totalling $17,000.
 

 But this $57,000 package hardly was as attractive as Cohn pretends it was. First, the jury need not have believed that the earlier assumption of Harry’s debt was a part of the real estate transaction. The two were separated by close to a year in time, and when Robert Cohn described the transaction he did not initially include the assumed debt as part of the consideration for the real estate. And in any event, the $40,000 note was a 20 year note with a six per cent interest rate. The jury might have concluded that this note was worth less than its $40,000 face value. Given these facts, the jury might have believed that Robert Cohn paid Harry less than $40,000 for real estate valued by Harry at $65,000.
 

 We think that the tasks, of choosing from among these alternative characterizations and of deciding the fairness of the consideration, were properly jury questions.
 
 [22]
 
 The jury verdict against the defendant necessarily incorporates the jury’s conclusion that the consideration was not fair. We cannot under these circumstances hold that the consideration was fair as a matter of law. The district court correctly denied the defendant’s motion for directed verdict on this ground.
 

 C.
 
 Cash
 

 Cohn next asks that we find the district court erred in failing to direct a verdict for him because plaintiff did not prove the requisite intent and knowledge
 
 *1160
 
 behind the Georgia fraudulent transfer claim concerning the $20,000 check he received from his father in September, 1976.
 
 [23]
 

 The Georgia Code provides that:
 

 The following acts by debtors shall be fraudulent in law against creditors and others, and as to them null and void, viz:
 

 2. Every conveyance of real or personal estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description, had or made with intention to delay or defraud creditors, and such intention known to the party taking. A bona fide transaction on a valuable consideration, and without notice or ground for reasonable suspicion, shall be valid.
 

 3. Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor insolvent at the time of such conveyance.
 

 Ga. Code Ann. § 28-201 (Harrison 1980). Cohn argues that the transfer of the $20,-000 does not fit within section 28-201(2) because there was no intention to defraud creditors and Robert Cohn further had no knowledge of such intention, even if it existed. The plaintiff, of course, disputes these contentions, arguing that sufficient evidence was offered on these elements.
 

 We agree with the plaintiff. The Georgia Supreme Court has stated that:
 

 When a conveyance, a security deed, or a mortgage is attacked as having been made to hinder, delay, or defraud the creditors of the maker of such instrument, circumstantial evidence is of the highest importance in determining the good faith or bad faith — the real intent— of the grantor in the execution of the instrument. Direct testimony as to the real intent of the grantor and grantee whose motives are under attack can only be obtained from these interested persons, and consequently necessarily any circumstance that may throw light on their conduct and motive is admissible for the jury’s consideration. “Fraud may not be presumed, but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence.” Civil Code, § 4626. In 27 C.J. 822, § 771, the rule of evidence is thus stated: “Since proof of fraud is seldom if ever possible by direct evidence, recourse to circumstantial evidence is a necessity, and there is no kind of action wherein it can be held with greater reason that the fact in issue may be inferred from other facts proved than in cases of this character. Circumstances apparently trivial or almost inconclusive, if separately considered, may by their number and joint operation, especially when corroborated by moral coincidence, be sufficient to constitute conclusive proof.”
 

 Eberhardt v. Bennett,
 
 163 Ga. 796, 802, 137 S.E. 64 (1927). Evidence of an intent to defraud creditors is dramatically shown by the circumstantial evidence. Days after Pauline Cohn guaranteed a loan for approximately $247,000, the value of her most valuable assets, the “McDonald’s” securities, was seriously impaired by dilution. Eventually almost all the value of these securities had flowed from Pauline to Robert, with very small consideration reaching Pauline’s hands. A valuable piece of real estate too was transferred from the soon-to-be-bankrupt Harry Cohn to Robert who arguably paid only a fraction of its value. And in the midst of these “deals,” Robert received a check for $20,000 from Harry.
 
 [24]
 
 In short, the pattern is altogether clear. Valuable assets held by members of the Cohn family were consistently transferred from family members soon to declare bankruptcy. This pattern of circumstantial evidence sufficed to create a fact question concerning the intent behind each transfer. And the beneficiary of this largess should have had notice of this intent because of his “good fortune.” Moreover, Robert Cohn
 
 *1161
 
 testified that he knew his father, Harry, “needed money” in this time period. Indeed, that was the purported reason behind Harry’s sale of the real estate. In addition, Harry testified that as early as 1976, Robert had “relieved [him] of [some] debts because in 1976, I owed the bank a lot of money.” Given these facts, it is only a short inferential leap to the conclusion that Robert knew that his parents’ financial situation was deteriorating and the transfers were made with the intent to keep assets within the family at the expense of the creditors.
 
 Compare Boone v. Rabun,
 
 183 Ga. 318, 188 S.E. 524 (1936). The issue then was correctly presented to the jury which resolved it against the defendant.
 
 [25]
 

 II.
 
 Damages
 

 Robert Cohn raises two issues regarding the plaintiff’s award of damages. The jury awarded $247,000 general damages and $10,000 punitive damages. First, Cohn questions whether an award of punitive damages of any amount was proper. Second, he argues that general damages totalling $247,000 were not proved.
 

 A.
 
 Punitive Damages
 

 The defendant argues that no facts in this case warranted a submission to the jury of the punitive damages question. The parties apparently agree that Georgia law controls. They further agree that Georgia courts would not award punitive damages for breach of contract, Ga. Code Ann. § 20-1405 (Harrison 1977), but would award such damages in response to tortious conduct. Given these concessions by the parties, we find that Cohn’s claim of error is without merit. Georgia law holds that “[f]raud, if found, is tortious conduct” and will justify punitive damages.
 
 Diana v. Monroe,
 
 132 Ga.App. 669, 672, 209 S.E.2d 70 (1974). Indeed, Georgia law holds that “in an action for breach of contract, where there are matters of record relating to fraud, punitive damages can be awarded.”
 
 Clark v. Aenchbacher,
 
 143 Ga.App. 282, 284, 238 S.E.2d 442 (1977). The evidence of the defendant’s participation in the fraudulent scheme, therefore, justified the district court in putting the question of punitive damages to the jury.
 

 B.
 
 General Damages
 

 Cohn contends that there is no evidence justifying the general damage award of $247,000. His sole dispute of substance relates to the value of Larry and Pauline Cohn’s securities. He argues that their undiluted securities were worth only $102,-572.05, because they would have received that amount had they sold their interest directly to McDonald’s Corporation absent any dilution, or sale of their interests to Robert. The defendant may be correct in this valuation, but the jury had substantial evidence to the contrary. On their financial statement submitted to Columbus Bank and Trust for the purpose of obtaining credit, Pauline and Harry Cohn valued those securities at $200,000. The jury could choose to believe that the Cohns’ $200,000 valuation, relied upon by the bank, was the correct valuation. The defendant concedes that in addition at least $47,520.00 more of value flowed to him from the bankrupts.
 
 [26]
 
 Although we might find that a damage figure greater than $47,520 is justified for
 
 *1162
 
 those various transactions, when the conceded figure is added to the $200,000 figure for Pauline’s securities, it is clear that the jury might have found that the defendant received $247,000 of value beyond what he paid.
 
 [27]
 

 III.
 
 Jury Instructions
 

 The defendant also claims that the district court erred in three respects in giving instruction to the jury. He did not raise these objections to the court’s charge when it was given. We have reviewed the alleged errors and believe it unnecessary to give a detailed analysis. It is sufficient that this Court concludes that in this case there is implicated no “broader interest than that of the immediate litigants” and that none of alleged errors rises the “exceptional” level required to constitute “plain” error.
 
 See Wirtz v. International Harvester Co.,
 
 331 F.2d 462, 465-66 (5th Cir. 1964). We decline to set aside the jury’s verdict for the alleged errors when the defendant did not allow the district court to take the minor corrective steps, if any, that would have been needed.
 

 IV.
 
 Motion for New Trial
 

 The defendant Cohn also appeals the district court’s denial of his motion for new trial.
 

 To reverse a district court’s denial of a motion for new trial this Court must find that the district court abused its discretion.
 
 See United States v. 41 Cases, More or Less,
 
 420 F.2d 1126, 1132 (5th Cir. 1970). Although normally the same standard is applied to review of grants of new trials, in fact, where the trial judge denies the motion for new trial, our review is more limited than in those instances where a litigant appeals a grant of a new trial, because deference to the trial judge, jury, and the constitutional allocation of fact questions to juries, all press toward affirmance where a litigant appeals a denial of a new trial.
 
 See Massey v. Gulf Oil Corp.,
 
 508 F.2d 92, 94-95 (5th Cir. 1975). All such factors presently press this Court. After a careful review of the record, we are convinced that both the judge and jury who heard the evidence in this case reached a permissible conclusion. The district court’s denial of motion for new trial should be affirmed.
 

 The judgment is AFFIRMED.
 

 [1]
 

 . Larry Cohn owned five shares in both PLB Corporation and PLB Enterprises, in addition to owning eight shares in CC & M.
 

 [2]
 

 . Sixty shares of PLB Corporation were pledged by Pauline Cohn as owner. Five shares of PLB Corporation were pledged by Pauline Cohn “as legal custodian of Larry Cohn a minor owner.”
 

 [3]
 

 . Both parties attempt to value Larry Cohn’s stock by computing the money he would have received from McDonald’s Corporation if he had sold his original share of the business directly to them. Beyond this similarity in basic approach the parties and the evidence are in hopeless confusion. Gower asserts that Larry Cohn’s stock was worth approximately $10,-520. Robert Cohn in his reply brief apparently concedes that this figure is correct, even though it failed to account for Larry Cohn’s ownership of eight sháres in CC & M and Robert Cohn’s main brief adopts a valuation of Pauline and Larry’s combined shares that implicitly attributes a value of approximately $15,804 to Larry’s initial holdings in the three corporations. Using Cohn’s method and substituting the higher sale price ($100,000) of PLB Enterprises supported by Robert Cohn’s testimony, we feel that a value of greater than $17,000 for Larry’s share was possible from the evidence.
 

 [4]
 

 . The bank officer who testified apparently understood the collateral to be all of Pauline Cohn’s stock because he stated that the bank took $200,000 of stock as the collateral and $200,000 was the total value of McDonald’s stock listed on the financial statements.
 

 [5]
 

 . This conclusion holds if ninety-nine shares were outstanding for each corporation. Robert Cohn testified that each corporation had ninety-nine shares outstanding. But the corporate records for PLB Corporation show that Pauline
 
 *1150
 
 Cohn held an additional eighty-four shares that were apparently still outstanding and are unaccounted for. This unexplained fact is corroborated by Robert Cohn’s initial testimony, later retracted, that before the dilution Pauline owned more than ninety-nine shares in PLB Corporation. We are unaware of the significance of these additional shares, as neither party otherwise mentions their existence. In any event, substantial dilution occurred.
 

 [6]
 

 . Robert Cohn testified that he paid a total of three dollars for all these shares issued to him by the three corporations. He, however, claims that he and Gary Mudge received these shares for their services.
 

 [7]
 

 . This debt, according to Robert Cohn, was not fully repaid.
 

 [8]
 

 . The three issuances of approximately 75,000 shares to Robert Cohn may not have occurred prior to July, 1977. The Cohns introduced evidence showing that all the issuances took place by June, 1976. Gower introduced evidence showing that the largest issuances had not occurred by March 18, 1977, and some evidence reveals that the date when the shares could have been issued, was July, 1977. See note 17
 
 infra.
 
 Under this view, the sales and issuances of shares to Robert Cohn in July 1977, would have been for inadequate consideration and thus Robert Cohn would have cheated his mother and brother at that time. In that case, the telephone call would not only have furthered the deceptive scheme, it would have contained deception, because Robert Cohn would have then ordered his mother to sign papers authorizing an unjustified issuance and/or selling her shares for a fraction of their value.
 

 [9]
 

 . McDonald’s evidently required Robert Cohn to sign an affidavit swearing that he would deliver Pauline Cohn’s shares no later than April 12, 1978. As of the date of the trial, the certificates of Pauline’s shares in PLB Corporation were still held by the Columbus Bank and Trust as collateral on loans that have not been repaid.
 

 [10]
 

 . Q: Well, without going through a great detail, in July of ’78, when I asked you the question and I showed you the minutes where you had signed, authorizing the issuance of seventy-five thousand shares to Robert for one dollar, and I asked you if you had signed those papers, and you said, “Yes.” And I asked you if you had ever seen those papers before — before today, the day I showed them to you, and you said “No.” And I asked you if you had any idea at all or if you knew that seventy-five thousand shares had been issued to Robert for one dollar before I had just told you that and you said that you had no idea that had been done.
 

 A: All right, then, I will show you how mixed up I was. If you gave me the paper with my signature on it and you asked me if I had seen it before you showed it to me in your office, and I said “No, this is the first time I have seen it,” then I had to be pretty mixed up because I signed the paper. I didn’t have time maybe to read it then because my husband was sick, and I wasn’t in the mood to read the papers. I signed that paper, so I had to have seen the papers before.
 

 [11]
 

 . Plaintiff in his brief sought to prove this point by reference to that portion of the record where he read Pauline Cohn’s prior statement that conflicted with her present testimony.
 

 Let me ask you, Mrs. Cohn, this is the deposition you gave on July of ’78, on page twenty-two, I asked you — this is where I was showing you some papers at that time— question, “And, on March of 1976, you have signed some minutes where some stock was conveyed to your son, Robert and some to Mr. Mudge, do you remember those minutes?” Answer, “No.” Question, “Do you remember stock being issued in PLB Corporation to Mr. Mudge?" Then you asked me “In 1976?” And I said, “Yes, Ma’am.” And your answer was, “No.” And I said, “Some issued to Robert Cohn?” The answer was, “No.” And I said, “Okay, if the minutes showed one hundred thirty-five shares were issued in March of ’76 to Robert and forty-six to Mr. Mudge in the PLB Corporation, do you know why that was done?” And your answer was, “No, sir, I have absolutely no idea.” Then I asked you,
 

 “Before I just told you that, Mrs. Cohn, did you know that that had been done?” And you answer, “No, sir, I absolutely did not know.” Then I asked you, “Okay, now, let me ask you, in June of 1976, the minutes of the PLB Corporation reflect that seventy-four thousand eight hundred sixty-five shares were conveyed to your son, Robert. Do you remember signing those minutes?” And your answer was, “No, sir.” Question, “Do you know why those shares were issued to Robert?” Answer, “No, sir.” Question, “All right. The same minutes show, talking about in June of ’76, twenty-four thousand nine hundred fifty-four shares were issued to Mr. Mudge. ’ Do you know why those shares were issued to him?” Answer, “No.” Question, “Do you know they were — did you know that seventy-four thousand eight hundred sixty-five shares were issued to Robert before I just told you that? And your answer was, “I had no idea.” Question, “And would
 
 *1154
 
 your answer be the same with regard to Mr. Mudge?” Answer, “Yes, sir, it would be the same.”
 

 So on the seventy-five thousand shares, in July of 1978, you had no idea whatever before I told you that Mr. Robert Cohn had received seventy-five thousand shares, did you?
 

 Plaintiff apparently treats this impeachment as substantive evidence.
 

 Plaintiffs position rests on a mistaken assumption that any materials once admitted for impeachment also become substantive evidence. Prior to the advent of the Federal Rules of Evidence every circuit court held with the “orthodox rule” of hearsay that “prior inconsistent statements may be used to impeach, but should not be treated as having any substantive or independent testimonial value.”
 
 United States v. Tavares,
 
 512 F.2d 872, 874 & n. 6 (9th Cir. 1975). In
 
 United States v. Hill,
 
 481 F.2d 929, 932 (5th Cir. 1973), this Court expressed its adherence to the orthodox rule. The Federal Rules of Evidence modified the orthodox rule and we have no doubt that today certain prior inconsistent statements may be used in federal court as substantive evidence,
 

 a statement is not hearsay if — ... the declar-ant testified at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition ...
 

 Fed.R.Evid. 801(d)(1). This Court has recognized that the new rule allows prior sworn statements to be used more freely.
 
 United States v. Sisto,
 
 534 F.2d 616, 624-25 & nn. 10, 11 (5th Cir. 1976). The plaintiff only used prior testimony of the Cohns after receiving answers at variance with prior statements. This procedure was quite proper under rule 801(d)(1)(A), “which admits prior inconsistent statements
 
 ... as substantive evidence
 
 of the facts stated.” 3 J. Weinstein & M. Berger, Weinstein’s Evidence ¶ 607[06], at 607-59 (1978). “Rule 801(d)(1)(A) will theoretically enable a party to make out a prima facie case even if his only evidence is a prior inconsistent statement of this type.” 4
 
 id.
 
 ¶ 801(d)(l)(A)[01], at 801-86. However, plaintiff never sought to use those statements beyond impeachment. The district judge clearly believed these statements were being used only as impeachment tools rather than as substantive evidence. Plaintiff did not seek to correct that impression. In fact, plaintiff in his brief states at another point that: “Not once did the [plaintiff] use any testimony or deposition taken in prior proceedings for any purpose other than to impeach.” And the only jury instruction given regarding prior inconsistent statements only instructed the jury that such statements could be used as impeachment tools. Where a limiting instruction is given, the jury may consider the prior inconsistent statement only as impeachment, and not as substantive evidence.
 
 United States v. Dennis,
 
 625 F.2d 782, 796 & n. 7 (8th Cir. 1980). The circumstances of the present case are such that we feel the statements were not substantive evidence properly before the jury.
 

 Having said this much, we have indirectly answered Cohn’s claim that the district court erred in allowing Gower to use depositions during cross-examination of witnesses. Impeachment by prior inconsistent statement is horn-book law. McCormick’s Handbook of the Law of Evidence §§ 34-39 (2d ed. E. Cleary ed. 1972). Gower’s use of depositions amounted only to impeachment by prior inconsistent statement. We have examined the instances specified by Cohn and see no indication that anyone at trial believed this use was for any purpose other than impeachment. Cohn’s overly-broad attack must fail.
 

 [12]
 

 . MR. GOWER: When your son, Robert, called you in July of ’77, do you remember that conversation?
 

 A: Yes. Bobby called us to come to Atlanta and I said, “Bobby, Daddy is sick, and I can’t get to Atlanta. Could I sign the papers here?” And, he said, “I will let you know, I will check back with you.” In the meanwhile, he spoke to the lawyer. The lawyer had, I think, — he told me he was going to spend the night at his father-in-law’s house or something and that he had relatives here in Columbus, Georgia. That was the reason he was coming. He would bring me the papers. Bobby said, “You don’t have to worry. I can get the papers to you in Columbus.”
 

 Q: Well, did your son say something like this, and to quote you exactly, “Mother, I want you to please sign these papers.”
 

 A: That was the gist of what he said.
 

 [13]
 

 . Q: When the lawyer came for you to sign the papers, you didn’t read them did you?
 

 A: I didn’t have time that day, no, I really didn’t.
 

 
 *1155
 
 Q: You didn’t read them because you trusted your son, and you would sign whatever he wanted you to sign?
 

 A: Yes, and I still do because he kept me informed on everything. I figured it wasn’t necessary to sit and read every piece of paper. I knew what was going on in the business.
 

 [14]
 

 . Q: When Mr. Goodman’s law partner came down, Mr. Harry was sick. The lawyer came in your house, and didn’t you in essence say, “Just point me where I have got to sign, and I will sign”?
 

 [Answer]: . . . Yes, in essence I did say, “Yes, I will sign it anyplace you want me to.”
 

 [15]
 

 . Rather the first time when she claims to have received the information was when he gave her the money for the shares, an event which according to Cohn’s statement in his brief occurred after the signing.
 

 Q: When your son, Robert — tell us — in July of ’77, did he tell you something like, “Mama, I am going to be buying you all’s stock in McDonald’s for about five hundred and fifty dollars”?
 

 A: First of all he doesn’t call me “Mama.” And, I don’t like that phrase. He said to me, “Mother, I am selling your stock.” I said, “Fine, I will give it to you if you want it.” But he did not tell that to me over the telephone. He told it to me in his house when he gave me the money.
 

 Q: When he what?
 

 A: When he gave me the money for the stock. I misunderstood what he meant and I said — I though he said, “Give this to Larry for the stock,” which I thought was merchandise in the Haberdashery. So, I gave Larry all of the money, and I didn’t get anything. Not because Bobby didn’t give it to me, but because I didn’t listen.
 

 And at that time Pauline Cohn did not understand why Robert Cohn gave her the money, so it is not clear that she even then understood that she had sold her shares for a few hundred dollars.
 

 [16]
 

 . Q: All right. Mrs. Cohn, your twelve thousand dollars a year stopped in the month of July of ’77? '
 

 A: That is right.
 

 Q: And right before your twelve thousand dollars a year stopped, you figured your stock in McDonald’s was worth two hundred thousand, dollars?
 

 A: Well, yes, it was worth to me — because it was a family corporation and it was a small corporation, we figured that if we invested two hundred thousand dollars at six percent, we would get — I would get my twelve thousand dollars. It was only worth it to me. It was a small family corporation. It wasn’t worth it on the market, on the open market.
 

 Q: But, for some years you had been receiving twelve thousand dollars a year and then that stopped in July of 1977?
 

 A: That’s right.
 

 Q: And on your financial statements that you and Mr. Harry issued, you all had always put two hundred thousand dollars as the value of your stock in McDonald’s?
 

 A: Yes.
 

 Q: And that is what your opinion was as to what it was worth before your checks stopped in July of ’77?
 

 A: That’s right.
 

 [17]
 

 .In fact, we believe the plaintiff offered sufficient evidence showing that most, if not all, of the deception occurred at one time. The plaintiff maintains that the great bulk of the dilution of stock occurred in July, 1977. The defendant argues that the dilution was completed by June 1976. Plaintiff contends that the “papers” signed in July 1977 included not only papers transferring shares to Robert Cohn but also papers authorizing the greatest part of the dilution. Pauline Cohn, by at least some of the evidence, did not read or comprehend the import of the papers she signed in July, 1977. There was evidence showing that by March 1977, the “great dilution” had not yet occurred. In addition, Pauline Cohn tied the dilution to the July, 1977 paper signing by her explanation of her failure to read the papers authorizing the “great dilution.” See note 10
 
 supra.
 
 She stated that she did not read the authorization papers in part because her husband was ill at that time. Pauline Cohn’s previous references to Harry Cohn’s illness placed it in July, 1977, a date when the Cohns admitted the stock was transferred. Moreover, in December, 1976 and up to July, 1977, after the Cohns contend the dilution had occurred, Pauline Cohn still valued her interest in the restaurants at $200,000. This fact might be taken as evidence that the stock sold, was, in any event, worth $200,000 to Pauline Cohn. The jury might have concluded that almost all, or all, the deception oc
 
 *1156
 
 curred in July, 1977, because some evidence showed that both the transfer and the “great dilution” occurred at the same time and place and that Pauline Cohn, in any event, sold an asset she valued at $200,000 for only a few hundred dollars.
 

 [18]
 

 . A similar ruling was proper with respect to Larry Cohn’s knowledge on this issue. He admitted that he did not read the papers that were signed in July, 1977. In addition Larry Cohn affirmed at trial that as late as March 1978, he had believed that Pauline and Larry Cohn were still the majority stockholders, a belief that could only be reasonable if he was unaware of: the dilution, the transfer of shares to Robert, and the sale of shares to McDonald’s Corporation. Given this evidence, the jury had a proper basis for finding that Larry Cohn was unaware of information.
 

 [19]
 

 . This interpretation draws additional support, if any is needed, from
 
 Rifkin’s
 
 quotation of a case from the Court of Appeals for the Third Circuit which stated that:
 

 If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiffs decision as to the transaction would not have been different from what it was, then the nondisclosure cannot be said to have caused the subsequent loss and under the principles of the law of fraud, recovery should be denied... However, in light of the Supreme Court’s holding in
 
 Affiliated Ute,
 
 the burden of proof rests squarely upon defendant to establish the “non-reliance” of plaintiff.
 

 Rochez Bros. v. Rhoades,
 
 491 F.2d 402, 410 (3d Cir. 1974),
 
 quoted at
 
 574 F.2d at 262 n.3.
 

 [20]
 

 . We agree with the Court of Appeals for the Ninth Circuit that this conclusion does not conflict with any narrowing of
 
 Ute
 
 resulting from
 
 Chiarella v. United States,
 
 445 U.S. 222, 229-30, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980). Although
 
 Chiarella
 
 may narrow the part of
 
 Ute
 
 which indicates there might be liability for omissions absent a relationship of trust between victim and deceiver, reliance otherwise is not a part of the plaintiffs case concerning an omission.
 
 SEC v. Murphy,
 
 626 F.2d 633, 652 n.23 (9th Cir. 1980). Robert Cohn undoubtedly had a relationship of trust with Pauline and Larry Cohn.
 

 [21]
 

 . Plaintiff brushes aside this state law argument as a “disguise.” Defendant’s argument, although not necessarily convincing, is not totally frivolous either. Even in general federal question cases, state law may control subsidiary issues relating to the nature and character of rights acquired under state law.
 
 See
 
 Special Project,
 
 Time Bars in Specialized Federal Common Law,
 
 65 Cornell L.Rev. 1011, 1026 n. 79 (1980). The sufficiency of those rights to satisfy the federal right of action might ultimately still be a question of federal law. See Hart & Wechsler’s The Federal Courts and the Federal System 762-70 (2d ed. 1973).
 

 [22]
 

 .
 
 Brown
 
 v.
 
 Womack,
 
 362 F.Supp. 1110 (M.D.La.1973), the only case cited by the defendant on the equivalence question, is not to the contrary. In that case, the district court sitting as finder of fact, concluded that a payment of eight and one-half per cent less than the court-determined value of property was equivalent. In this case, the payment may be well over 35 per cent shy of the real estate’s value depending on the resolution of the above-mentioned issues.
 

 [23]
 

 . Appellant raises similar concerns with respect to the transfer of real estate, and identical answers hold for each category of assets.
 

 [24]
 

 . The check is in evidence. Robert stated that he was a “conduit,” passing the money to Larry. But the jury need not have believed his “conduit” explanation.
 

 [25]
 

 . After raising the § 28-201(2) issue discussed above, appellant argues that the $20,000 transfer could not fall under § 28-201(3) because there was no proof of insolvency in September 1976. Appellant’s argument is made in the alternative indicating his belief that if he wins his argument under § 28-201(2), he may still face an argument from the plaintiff that the $20,000 transfer fits under § 28-201(3). Plaintiff does not raise such an argument and given our conclusion that the evidence supports a conclusion that the transaction fits under § 28-201(2), we feel that appellant’s argument in the alternative need not be reached.
 

 [26]
 

 . The assets were $20,000 cash, $17,000 from the real estate sale, and $10,520 of stock from Larry. The defendant contends that the $10,-520 value of stock derives from what Larry could have sold his undiluted stock to McDonald’s Corporation and the jury cannot inconsistently use this value for Larry’s stock and not use the same method for Pauline’s stock. The easy answer to this argument is that verdicts rendered by juries need not be consistent.
 

 [27]
 

 . This conclusion can be reached after subtracting between the $500 to 550 received by Pauline and Larry for their securities.