REVISED DECEMBER 14, 2006

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 22, 2006

Charles R. Fulbruge III
Clerk

No. 05-41213

FIBER SYSTEMS INTERNATIONAL INC

Plaintiff - Counter Defendant - Appellant - Cross-Appellee

v.

DANIEL ROEHRS; MICHAEL FLOWER; THOMAS HAZELTON; RICK HOBBS; KIERAN MCGRATH; APPLIED OPTICAL SYSTEMS, INC., OPTECONN G.P., INC., AND OPTECONN, L.P., D/B/A OPTICAL CABLING SYSTEMS

Defendants - Counter Claimants - Appellees - Cross-Appellants

Appeal from the United States District Court
for the Eastern District of Texas, Sherman

Before KING, GARWOOD, and JOLLY, Circuit Judges.

KING, Circuit Judge:

Fiber Systems International, Inc. appeals (1) the district court's entry of a take-nothing judgment on the company's claim for damages under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, (2) the district court's grant of partial summary judgment dismissing the company's claim for injunctive relief under the Act, and (3) the district court's denial of judgment as a matter of law and a new trial on the defamation counterclaim

1

raised by Daniel Roehrs, Michael Flower, Thomas Hazelton, Rick Hobbs, and Kieran McGrath (collectively, the "individual defendants"). Defendants conditionally cross-appeal (1) the district court's grant of partial summary judgment dismissing defendants' counterclaim for defamation of Applied Optical Systems, Inc., Opteconn G.P., Inc., and Opteconn, L.P., d/b/a Optical Cabling Systems (collectively, the "corporate defendants") and (2) the district court's judgment as a matter of law denying defendants' claim that Fiber Systems International defamed the individual defendants through statements in e-mails and letters. For the reasons that follow, we AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The claims at issue in this appeal arose from the final days of the struggle for control over Fiber Systems International, Inc. ("FSI"), a company that manufactures harsh-environment fiber-optic connectors for military use. The principal opponents in this conflict are brothers--Michael Roehrs, who was at that time part of the group that had a majority ownership of FSI, and defendant Daniel Roehrs, who was part of the minority group of shareholders. Daniel Roehrs and the other individual defendants, all of whom served as officers and directors of FSI, initiated litigation in 2001 to determine ownership of the company. The

2

lawsuit settled in August 2003 with an agreement allowing Michael Roehrs to buy out the minority owners' stake in the company. When the transaction closed on December 8-9, 2003, the individual defendants' employment was terminated and Michael Roehrs took control as Executive Chairman.

In the 2004 suit on appeal here, FSI alleged that defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, as they left the company. Specifically, FSI asserted that during their departure the defendants "knowingly and intentionally accessed, deleted, downloaded, copied, took, and stole FSI's confidential business and proprietary information and trade secrets, without authorization, from FSI's computers," misappropriated and stole FSI's computer equipment, and used and disseminated the wrongfully obtained information through the new companies that they formed: Daniel Roehrs, Thomas Hazelton, and Michael Flower through Applied Optical Systems, Inc. ("AOS") and Rick Hobbs and Kieran McGrath through Opteconn G.P., Inc. ("Opteconn") and Opteconn, L.P., d/b/a Optical Cabling Systems ("OCS"). FSI sought damages and injunctive relief under § 1030(a)(4), (a)(5), and (g) of the CFAA to compensate for the cost of data recovery and to prevent the defendants from continuing to use and disseminate FSI's trade secrets.

Defendants filed a defamation counterclaim alleging that FSI falsely accused them of being thieves. They relied on several documents in which FSI allegedly accused the defendants of, inter

3

alia, stealing its intellectual property, as well as deposition testimony showing that FSI accused the individual defendants of being thieves or stealing FSI's intellectual property.

Defendants later moved for partial summary judgment on FSI's claim for injunctive relief, arguing that FSI failed to establish the prerequisites for such relief because there was no evidence that any of the defendants were currently accessing FSI's computers or threatening access in the future.[1]  FSI moved for partial summary judgment on the corporate defendants' counterclaim, arguing that the evidence was insufficient to show that the corporate defendants were defamed.  The district court granted both motions.

In March 2005, the case proceeded to a jury trial on the remaining claims.  At the conclusion of the evidence, the district court submitted FSI's claims under § 1030(a)(4) and (a)(5) of the CFAA to the jury, but submitted only three statements to the jury on defendants' defamation counterclaim:  a police report filed by FSI alleging that defendants had committed theft and statements made by FSI to two companies accusing defendants of being thieves.

With regard to FSI's claims, the jury found that none of the individual defendants violated § 1030(a)(5) but that three defendants--Daniel Roehrs, Thomas Hazelton, and Rick Hobbs--

---

[1]  Defendants also moved for summary judgment on FSI's entire CFAA claim, which the district court denied.

4

violated § 1030(a)(4), entitling FSI to $36,000 in total damages. However, the district court entered a take-nothing judgment, holding that § 1030 does not create a civil cause of action for violations of subsection (a)(4).

As to defendants' counterclaims, the jury found that FSI maliciously accused all five individual defendants of being thieves in its statements to the two companies but that the police report was not filed with actual malice. Based on the two defamatory statements, the jury awarded the individual defendants $100,000 each in compensatory damages and $1,000,000 each in punitive damages. Because Texas law places a cap on punitive damage awards, the district court reduced the punitive damages to $200,000 for each defendant.

After the jury verdict, FSI filed a renewed motion for judgment as a matter of law and, in the alternative, for a new trial. The district court denied this motion, and FSI timely filed a notice of appeal.

## II. DISCUSSION

In this appeal, FSI challenges the district court's holding that § 1030 of the CFAA does not create a civil cause of action for subsection (a)(4), as well as the court's grant of summary judgment dismissing FSI's CFAA claims for injunctive relief. FSI also contends that the district court erred in denying judgment as a matter of law because the jury's defamation verdict was

5

based on evidence that was never admitted for substantive use and the statements allegedly made by FSI were nondefamatory. Finally, FSI argues that the district court erred in denying a new trial because the jury verdict contained inconsistencies and the district court improperly admitted evidence of nondefamatory statements, which prejudiced the jury's defamation findings.

Defendants conditionally cross-appeal the district court's grant of summary judgment dismissing the defamation claims that were based on statements against the corporate defendants, arguing that the statements should have been submitted to the jury as substantive evidence of defamation. Defendants also conditionally cross-appeal the district court's decision not to submit those statements to the jury as additional instances in which FSI defamed the individual defendants.[2]

In the analysis that follows, questions of law are reviewed de novo. See Af-Cap, Inc. v. Republic of Congo, 462 F.3d 417, 423 (5th Cir. 2006).

## A. FSI's CFAA Claims

### 1. Civil Liability Under § 1030(a)(4)

Despite the jury's finding that Daniel Roehrs, Thomas Hazelton, and Rick Hobbs violated § 1030(a)(4) of the CFAA,

---

[2] Defendants stated that they only wished to pursue these cross-appeals in the event that this court does not affirm the district court's final judgment. Because we do not, the cross-appeals are considered in this discussion.

entitling FSI to damages totaling $36,000, the district court held that the CFAA does not create a civil cause of action for violations of § 1030(a)(4), and it entered a take-nothing judgment on the claim. FSI appeals, alleging that civil claims for violations of § 1030(a)(4) can be brought under § 1030(g) and that the jury found the elements necessary for entry of judgment on FSI's behalf.  We agree.

The CFAA criminalizes various fraudulent or damaging activities related to the use of computers.  Two of its provisions were before the jury in this case.  Section 1030(a)(4) prohibits the "knowing[] . . . access[ of] a protected computer without authorization," with intent to defraud, if "such conduct furthers the intended fraud and [the violator] obtains anything of value."  18 U.S.C. § 1030(a)(4).  Section 1030(a)(5) punishes those who cause damage to a protected computer, either through the knowing transmission of a program, information, code, or command, or through intentional, unauthorized computer access.

Civil actions are authorized for some, but not all, violations of § 1030's substantive provisions.  Section 1030(g) provides:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.  A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B) . . . .

Based on its reading of § 1030(g), the district court held that the section does not create a civil action for violations of § 1030(a)(4).  Similarly, defendants argue that the explicit terms of § 1030(g) only authorize civil actions for violations of § 1030(a)(5).

However, this interpretation is at odds with the language of the statute, which plainly allows such an action to proceed.[3] Section 1030(g) extends the ability to bring a civil action to any person suffering damage or loss under "this section," which refers to § 1030 as a whole, as subsection (g) does not proscribe any conduct itself.  And although § 1030(g) refers to subsection (a)(5)(B), the statute does not limit civil suits to violations of § 1030(a)(5).  Indeed, if Congress intended to limit civil actions in this manner, it could have simply provided that civil actions may only be brought for violations of subsection (a)(5).

Instead, the statute provides that a claim brought under any of the subsections of § 1030 must involve one of the factors listed in the numbered clauses of subsection (a)(5)(B).  These factors are:

> (i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only,

---

[3]  In cases involving statutory construction, the plain language of the statute is conclusive unless Congress clearly expressed a contrary intent.  Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co., 419 F.3d 355, 362 (5th Cir. 2005).

loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(iii) physical injury to any person;

(iv) a threat to public health or safety; or

(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security . . . .

18 U.S.C. § 1030(a)(5)(B). Accordingly, a civil action may be maintained under § 1030(a)(4) of the CFAA if the violative conduct involves any one of these factors.[4] Our interpretation is consistent with that of other circuits that have addressed this question. See P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 512 (3d Cir. 2005) ("We do not read section 1030(g)'s language that the claim must involve one or more of the numbered subsections of subsection (a)(5)(B) as limiting relief to claims that are entirely based only on subsection (a)(5), but, rather, as requiring that claims brought under other sections must meet, in addition, one of the five numbered (a)(5)(B) 'tests.'"); Theofel v. Farey-Jones, 359 F.3d 1066, 1078 n.5 (9th Cir. 2004) ("[S]ubsection (g) applies to

---

[4] Thus, for a civil action involving a violation of subsection (a)(4), the requirements of subsection (a)(5)(A) need not be met.

9

any violation of 'this section' and, while the offense must involve one of the five factors in (a)(5)(B), it need not be one of the three offenses in (a)(5)(A).").

Nonetheless, defendants argue that even if a civil cause of action may be maintained under § 1030(a)(4) when one of the § 1030(a)(5)(B) factors is established, the jury instructions for FSI's § 1030(a)(4) claim do not mention any of those factors. Only the first factor from § 1030(a)(5)(B) is at issue here, requiring loss during any 1-year period that aggregates to at least $5,000 in value.

We review jury instructions for abuse of discretion when the instructions were properly objected to in the district court. See United States v. Freeman, 434 F.3d 369, 377 (5th Cir. 2005). But when the challenging party failed to preserve the error below, the instructions are reviewed for plain error. Positive Black Talk Inc. v. Cash Money Records Inc., 394 F.3d 357, 368 (5th Cir. 2004). To avoid plain error review, a specific objection must have been made on the ground raised on appeal, rather than a general objection to the instructions as a whole or an objection on a different ground. See id.; United States v. Fuchs, 467 F.3d 889, 500 (5th Cir. 2006). Defendants objected to the § 1030(a)(4) instructions on the ground that "there is no civil cause of action under (a)(4) of the CFAA," but did not object on the ground that the jury was not instructed on the loss element, and accordingly this challenge is subject to plain error

10

review.

"In reviewing jury instructions for plain error, we are exceedingly deferential to the trial court." Tompkins v. Cyr, 202 F.3d 770, 784 (5th Cir. 2000). For defendants to prevail under the plain error standard, they must show that (1) an error occurred; (2) the error was plain, which means clear or obvious; (3) the plain error affects substantial rights; and (4) failing to correct the error would seriously impact the fairness, integrity, or public reputation of judicial proceedings. Septimus v. Univ. of Houston, 399 F.3d 601, 607 (5th Cir. 2005).

In determining whether a particular jury instruction was erroneous, we must consider the instructions as a whole. Russell v. Plano Bank & Trust, 130 F.3d 715, 721 (5th Cir. 1997). Although the jury charge failed to specifically instruct the jury to find one of the § 1030(a)(5)(B) factors as a prerequisite to civil liability under § 1030(a)(4), the damages instruction required the jury to determine the amount of loss caused by the CFAA violation. Following this instruction, the jury found that the three defendants' violations of § 1030(a)(4) caused FSI loss totaling $36,000, which far exceeds the $5,000 loss requirement. Despite defendants' argument that the "loss" found in the damages instruction is somehow different from the substantive element of "loss" within § 1030(a)(5)(B)(i), the damages instruction defined

11

"loss" exactly as defined in § 1030.[5]  The damages instruction also required the jury to find that the loss was "proximately caused by the conduct" that violated § 1030(a)(4), which was more than enough to satisfy the § 1030(g) requirement that the violative conduct "involve" one of the § 1030(a)(5)(B) factors. And even if this aspect of the instructions was erroneous, the jury's damages finding shows that no substantial rights were affected, as the jury would have found the $5,000 minimum met if instructed properly.

Further, although the damages instruction erroneously failed to require a finding that the $5,000 minimum loss occurred during a one-year period, the time element was inherent in the jury's finding, demonstrating that no substantial rights were affected. Of the damages alleged by FSI, defendants only identify $26,000, incurred by the efforts of a data recovery expert, as including some charges that derived from more than a year after the time of the CFAA violation.  But § 1030(a)(5)(B)(i) does not require that the loss only occur within a year of the CFAA violation; rather, it requires that the loss aggregate to $5,000 "during any 1-year period."  18 U.S.C. § 1030(a)(5)(B)(i) (emphasis added).  As

_____

[5]  As the jury instructions and § 1030 provide, "the term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

12

defendants acknowledge, the data recovery expert first became involved in November 2004, and his $26,000 fee included work through January 2005, all of which took place well within a one-year span. Regardless, the jury found $36,000 in loss, which at a minimum must have included $10,000 in loss associated with FSI's original data recovery efforts, all of which took place within a one-year span itself. Accordingly, the district court's failure to instruct the jury that it must find a loss of $5,000 during a one-year period was inconsequential.

## 2. Injunctive Relief

FSI also appeals the district court's summary judgment dismissal of FSI's claim for injunctive relief under the CFAA. The district court held that injunctive relief was unavailable to FSI because the CFAA only allows an injunction to prevent ongoing or future unauthorized access to FSI's computers, neither of which is shown here. FSI responds that it is threatened with present and future harm from defendants' possession and use of trade secrets stolen by defendants through the acts that violated § 1030(a)(4) and that an injunction should be available under the CFAA to remedy such a harm.

We need not address the question of whether an injunction may issue against the use of the information obtained through a past violation of § 1030(a)(4). Although the jury found that defendants violated § 1030(a)(4), which required a finding that

13

the defendants obtained something of value through their unlawful computer access, the jury also found that FSI <u>falsely</u> accused defendants of being thieves.  Thus, the value obtained by defendants could not have included stolen trade secrets.

"[T]he scope of injunctive relief is dictated by the extent of the violation established," and an injunction must be narrowly tailored to remedy the specific action necessitating the injunction.  <u>John Doe #1 v. Veneman</u>, 380 F.3d 807, 818 (5th Cir. 2004) (citing <u>Califano v. Yamasaki</u>, 442 U.S. 682, 702 (1979)); <u>Valley v. Rapides Parish Sch. Bd.</u>, 646 F.2d 925, 942 (5th Cir. May 1981).  Because the jury determined that defendants did not steal trade secrets through the acts that violated § 1030(a)(4), the requested injunction would be improper under the CFAA.[6]

**B.  FSI's Motion for Judgment as a Matter of Law**

FSI also appeals the district court's denial of judgment as a matter of law, arguing that the evidence upon which the jury's defamation verdict was based could not be considered as substantive evidence of defamation.  FSI further contends that even if the evidence is considered substantively, it was insufficient to support a claim of defamation per se.

---

[6]  FSI has also failed to show any other irreparable harm that would result from a failure to grant an injunction.  To obtain an injunction, FSI must establish "(1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest."  <u>VRC LLC v. City of Dallas</u>, 460 F.3d 607, 611 (5th Cir. 2006).

14

We review a district court's ruling on a motion for judgment as a matter of law de novo. Delano-Pyle v. Victoria County, 302 F.3d 567, 572 (5th Cir. 2002). Under this standard, all evidence is viewed "in the light and with all reasonable inferences most favorable to the party opposed to the motion." Id. (quoting Resolution Trust Corp. v. Cramer, 6 F.3d 1102, 1109 (5th Cir. 1993)). This court will not reverse the district court's denial of the motion "unless a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Id. (quoting Ellis v. Weasler Eng'g, Inc., 258 F.3d 326, 337 (5th Cir. 2001)).

### 1. Substantive Evidence

Under the Federal Rules of Civil Procedure, depositions may be used to "contradict[] or impeach[] the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence." FED. R. CIV. P. 32(a)(1). One of these other purposes is the use of a witness's prior inconsistent statements from a deposition as substantive evidence. FED. R. EVID. 801(d)(1)(A); Gower v. Cohn, 643 F.2d 1146, 1153 n.11 (5th Cir. May 1981). Conceding that Michael Roehrs's video deposition was admissible under these rules for both substantive and impeachment purposes, FSI contends that the defendants only actually used the deposition to impeach Michael Roehrs during cross-examination,

15

not as substantive evidence.  According to FSI, this rendered the jury unable to consider the deposition as evidence of defamation under Gower v. Cohn, 643 F.2d at 1153 n.11.

Gower recognized that "materials once admitted for impeachment [do not necessarily] also become substantive evidence" and held that the deposition evidence of prior inconsistent statements in that case was only offered to impeach. Id. at 1153 n.11.  However, Gower involved a situation in which both the district judge and the offering party clearly believed that the evidence was being used only to impeach, and in which the relevant jury charge "only instructed the jury that [the] statements could be used as impeachment tools."  Id.  Unlike Gower, the district judge in this case believed that "defendants used the prior inconsistent statements not merely to impeach, but also to prove that FSI had in fact defamed them," and the jury instructions provided that "[i]n determining whether any fact has been proved . . . [the jury] may, unless otherwise instructed, consider the testimony of all witnesses," which includes a witness's video deposition testimony.[7]

---

[7]  This instruction was not tempered, as FSI claims, by a subsequent provision in the jury instructions that, "[i]n determining the weight to give to the testimony of a witness," the jury should consider "whether there was evidence that at some other time the witness said or did something . . . that was different from the testimony the witness gave" during trial. This latter instruction merely provides that the jury may consider prior inconsistent statements for the purpose of impeachment, not that the jury may consider such statements only for that purpose.  In contrast, the instruction in Gower "only

16

Because the deposition testimony was accepted as both impeachment and substantive evidence by the district judge and submitted to the jury for both purposes, FSI can only challenge the propriety of that decision. Yet, as discussed above, the testimony was admissible as substantive evidence under Rule 801(d)(1)(A). Further, FSI failed to object to the jury instructions or request an instruction limiting the jury's consideration of the testimony to impeachment purposes. FSI had the burden of requesting such an instruction, and its undisputed failure to do so renders the jury instructions susceptible only to a challenge for plain error. See FED. R. EVID. 105; Savoie v. Otto Candies, Inc., 692 F.2d 363, 370 (5th Cir. 1982); United States v. Booty, 621 F.2d 1291, 1298-99 (5th Cir. 1980). As the deposition testimony was actually admissible for substantive use, no plain error exists. See Booty, 621 F.2d at 1299; United States v. Leslie, 542 F.2d 285, 289 (5th Cir. 1976).

## 2. Defamation Per Se

Defamation is a false statement about a person, published to a third party, without legal excuse, which damages the person's reputation. Moore v. Waldrop, 166 S.W.3d 380, 384 (Tex. App.--

instructed the jury that [prior inconsistent] statements could be used as impeachment tools," preventing the consideration of those statements as substantive evidence. Gower, 643 F.2d at 1153 n.11. Gower's reliance on United States v. Dennis, 625 F.2d 782, 796 n.7 (8th Cir. 1980), which denied substantive status for statements that jury instructions deemed "were to be used for impeachment only," confirms that Gower's holding on this point was based on a more limited instruction than is present here.

Waco 2005, no pet.).  In a claim for defamation per se, "[t]he words are so obviously hurtful that they require no proof that they caused injury in order for them to be actionable."[8] Columbia Valley Reg'l Med. Ctr. v. Bannert, 112 S.W.3d 193, 199 (Tex. App.--Corpus Christi 2003, no pet.).  "For a defamatory oral statement to constitute slander per se, it must fall within one of four categories:  (1) imputation of a crime, (2) imputation of a loathsome disease, (3) injury to a person's office, business, profession, or calling, and (4) imputation of sexual misconduct."  Gray v. HEB Food Store No. 4, 941 S.W.2d 327, 329 (Tex. App.--Corpus Christi 1997, writ denied).  The first category, which is at issue here, is met by a statement that "unambiguously and falsely imputes criminal conduct to" a party.  Id.  FSI argues that its allegedly defamatory statements did not unambiguously impute criminal conduct and were not false.

The evidence of FSI's defamatory remarks was provided by the testimony of Michael Roehrs, who spoke of statements that he made on FSI's behalf to Neil Wilkin at Optical Cable Corporation and statements that FSI employee Mike Dabrowski made to Lockheed Martin.  On cross-examination, after Michael Roehrs was asked whether he had told Neil Wilkin that the defendants were thieves or had stolen property, Roehrs answered that he told Neil Wilkin "that there has been misappropriation . . . of intellectual

---

[8]  In contrast, a claim for defamation per quod requires proof of actual damages.  Moore, 166 S.W.3d at 384.

18

property" but denied calling them thieves.  Defendants' counsel then played the following video deposition testimony from Michael Roehrs:

> Q.  Any other customers or vendors you know of that Fiber Systems has said to them the defendants [are] thieves or have stolen property?
>
> A.  Ne[i]l Wilkin with Optical Cable Corporation.
>
> Q.  All right.  Who told him that?
>
> A.  I did.

Also, after Michael Roehrs denied that Mike Dabrowski told a Lockheed Martin employee that defendants were thieves, defendants' counsel played the following video deposition testimony from Roehrs:

> Q.  Has FSI told anybody at Lockheed Martin that the defendants are thieves?
>
> A.  I think Mike Dabrowski, moreover, has let them know that there has been a misappropriation of intellectual property.
>
> Q.  By these defendants?
>
> A.  Yes.
>
> . . . .
>
> Q.  And he was authorized to make these comments by Fiber Systems?
>
> A.  Absolutely.

FSI first argues that this testimony does not show statements that are defamatory per se because they do not impute a crime.  FSI acknowledges the extensive precedent holding that a

19

false accusation of theft is defamatory per se, but argues that the recent Texas Court of Appeals decision in Moore v. Waldrop establishes that statements like those made here are nondefamatory because they merely involve terms of general disparagement.

Moore dealt with the defamatory nature of the statement, "You don't want to hire him, he's a crook." 166 S.W.3d at 383. The court held that standing alone, the word "crook" was merely a term of general disparagement, and did not impute a specific crime. Id. at 384; see also Billington v. Houston Fire & Cas. Ins. Co., 226 S.W.2d 494, 496 (Tex. Civ. App.--Fort Worth 1950, no writ)) (holding that the use of the words "liar" and "crook" were nondefamatory because they were used only as opprobrious terms). The district court here distinguished Moore by observing that the word "crook" differs from "thief" because the latter "much more directly imputes a crime than the word 'crook,'" and the court illustrated the point by quoting multiple, nondefamatory dictionary definitions for the word "crook." FSI challenges this conclusion by pointing to an alternative definition of "crook" as "a person who steals or cheats, swindler or thief," WEBSTER'S NEW WORLD DICTIONARY 330 (3d college ed. 1991), and by quoting several arcane, nondefamatory definitions of the word "thief," including its meanings as a "kind of wild bee said to rob hives" and an "excrescence in the snuff of a candle." See 17 THE OXFORD ENGLISH DICTIONARY 934-35 (J.A. Simpson & E.S.C. Weiner

20

eds., 2d ed. 1989).  Accordingly, FSI argues that the word "crook" is no different than the word "thief," and the outcome here should be the same as in Moore.

We need not resolve a battle of dictionary definitions in this appeal.  Texas case law firmly establishes that falsely accusing someone of stealing or calling someone a "thief" constitutes defamation per se.  See, e.g., Bennett v. Computer Assocs. Int'l, Inc., 932 S.W.2d 197, 200 (Tex. App.--Amarillo 1996, writ denied) ("One who falsely imputes to another the crime of theft commits slander per se. . . . Falsely calling someone a 'crook' or 'thief' or falsely accusing him of stealing property falls within the parameters of slander per se . . . ."); see also Glenn v. Gidel, 496 S.W.2d 692, 697-98 (Tex. Civ. App.--Amarillo 1973, no writ); Anderson v. Alcus, 42 S.W.2d 294, 296 (Tex. Civ. App.--Beaumont 1931, no writ).  In contrast, as recognized in Moore, Texas courts have determined that the term "crook" does not inherently have the same defamatory content.  See, e.g., Moore, 166 S.W.3d at 384; Billington, 226 S.W.2d at 496; Arant v. Jaffe, 436 S.W.2d 169, 177-78 (Tex. Civ. App.--Dallas 1968, no writ).  But when the word "crook" is used in a context imputing theft, it is also defamatory per se.  See Bennett, 932 S.W.2d at 200 (holding that "[f]alsely calling someone a 'crook'" was defamatory per se where the defendant called the plaintiff "a 'thief' and a 'crook' who had stolen . . . computer software").

While it is similarly possible that a false allegation of

21

theft could be made in a context that renders it nondefamatory, such a situation is not presented here. To affirm the district court's decision, it is sufficient that "the words used [were] reasonably capable of a defamatory meaning." <u>Musser v. Smith Protective Servs., Inc.</u>, 723 S.W.2d 653, 654-55 (Tex. 1987). "In answering this question, the court must construe [each] statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement."[9] <u>Gray</u>, 941 S.W.2d at 329. "The surrounding circumstances are the setting in which the alleged slanderous statement is spoken, consisting of the context of the statement and the common meaning attached to the statement." <u>Moore</u>, 166 S.W.3d at 386. "Only when the court determines the language is ambiguous or of doubtful import should the jury then determine the statement's meaning and the effect the statement's

---

[9] Although FSI agrees that courts must look to the surrounding circumstances in determining whether a statement is defamatory per se, FSI also argues that courts cannot look to the factual context of statements without turning such a claim into one for defamation per quod, which requires proof of actual damages, because courts cannot consider innuendo in a defamation per se claim. Innuendo refers to "extrinsic evidence used to prove a statement's defamatory nature" and "includes the aid of inducements, colloquialisms, and explanatory circumstances." <u>Moore</u>, 166 S.W.3d at 385.

However, <u>Moore</u> also points out that "[c]onsidering the surrounding circumstances does not necessarily require the use of extrinsic evidence," as courts must consider the context in which the statement was made and the common meaning of the statement. <u>Id.</u> As discussed above, FSI's statements were defamatory per se under these considerations, and extrinsic evidence need not be considered.

publication has on an ordinary reader." Musser, 723 S.W.2d at 655.

Here, deposition evidence showed that Michael Roehrs told Neil Wilkin that defendants were thieves or had stolen property,[10] which directly imputes specific crimes under Texas law.[11] See TEX. PEN. CODE ANN. § 31.03 (Vernon 2005) (punishing theft of property); Id. § 31.05 (Vernon 2005) (punishing theft of trade secrets); see also Gray, 941 S.W.2d at 329 (determining that an accusation of shoplifting was slanderous per se because shoplifting was punishable under the Texas Penal Code). As the defamation cases discussed above illustrate, the common meaning of FSI's statements imputed the crime of theft. And the surrounding circumstances present no factors that would alter the meaning of the statements, particularly considering the evidence in the light most favorable to the defendants. In fact, Michael Roehrs described in his live testimony that the statement to Neil Wilkin was made in the context of a discussion about the

---

[10] FSI contends that Michael Roehrs's deposition statement was insufficient evidence of defamation because he responded to the ambiguous question of whether FSI had communicated that "defendants [are] thieves or have stolen property." However, both alternatives are equally defamatory, in that they both impute the commission of the crime of theft.

[11] FSI's briefs only focus on whether the word "thief" is defamatory after Moore, leaving unaddressed whether Mike Dabrowski's statement that defendants "misappropriat[ed] . . . intellectual property" constituted defamation. We note, however, that Texas law defines a thief as, in part, someone who "unlawfully appropriates property." TEX. PEN. CODE ANN § 31.03 (Vernon 2005).

23

misappropriation of FSI's property by defendants, which supports the conclusion that the accusation of theft imputed that crime.

Nonetheless, FSI argues that from the context of the ongoing, heated controversy between FSI and the defendants, no person of ordinary intelligence could believe that FSI's statements were anything more than rhetorical outbursts of an angry and frustrated business owner, much less a real accusation of theft.  FSI relies on the Supreme Court's opinion in Greenbelt Co-Op Publishing Association v. Bresler, 398 U.S. 6, 13-14 (1970), which held that an accusation of blackmail during a heated city council debate was mere rhetorical hyperbole because the word, in context, clearly referred to the unreasonableness of legal negotiating proposals discussed at the debate rather than the actual crime of blackmail.[12]  But unlike Greenbelt, the circumstances here only bolster the conclusion that Michael

_____

   [12] FSI also cites state court cases from California, Georgia, and Connecticut to support this argument, but all involved a context that made the theft accusation nondefamatory. See Rosenauer v. Scherer, 88 Cal. App. 4th 260, 280 (Cal. App. 3d Dist. 2001) (involving a context that showed that the defendant was criticizing the plaintiff's political position rather than accusing the plaintiff of the crime of theft); Mathis v. Cannon, 573 S.E.2d 376, 382-83 (Ga. 2002) (holding that a theft accusation, in context, referred only to the "ongoing debate about [a] garbage disposal dispute," rather than an actual criminal act); Yakavicke v. Valentukevicius, 80 A. 94, 96 (Conn. 1911) (holding from the context of the theft accusation that the statement would be interpreted as conveying "that the plaintiff had cheated the club," not that the plaintiff had actually stolen from the club).  Unlike these cases, the context of FSI's theft allegations does not reveal anything from which a person of ordinary intelligence would derive a noncriminal implication.

24

Roehrs was referring to the commission of a crime. The accusation of theft, in context, did not refer to activities readily identifiable to the listener as innocuous, as in Greenbelt, but instead referred to the defendants' alleged misappropriation of FSI's intellectual property. The mere fact that an accusation arose from a heated controversy does not strip the statement of its defamatory content where a person of ordinary intelligence would nonetheless interpret the statement to impute a crime.

Finally, FSI argues that the statements made by FSI were true. "The truth of a statement is a defense to a claim for defamation." Gustafson v. City of Austin, 110 S.W.3d 652, 656 (Tex. App.--Austin 2003, pet. denied). This defense "does not require proof that the alleged defamatory statement is literally true in every detail; substantial truth is sufficient." Id. FSI argues that its statements were substantially true because the jury found that three of the defendants violated 18 U.S.C. § 1030(a)(4) and that FSI's report to the Allen Police Department was made without actual malice.

However, the jury specifically found that FSI's theft allegations were not substantially true. At most, the jury findings would be inconsistent, requiring a new trial. Willard v. The John Hayward, 577 F.2d 1009, 1011 (5th Cir. 1978). Thus, FSI's argument is properly addressed in connection with its argument that the district court should have granted a new trial

25

based on inconsistent jury findings, which is discussed later in this opinion. For purposes of the district court's denial of FSI's motion for judgment as a matter of law, the only question is whether the jury had a legally sufficient basis for finding that the allegations were not substantially true, and we are satisfied that defendants' testimony provided such a basis.

## C. Defendants' Cross-Appeal

Defendants raise in their cross-appeal two issues related to the district court's treatment of several documents that allegedly show additional defamatory statements by FSI. First, defendants argue that the district court incorrectly granted summary judgment dismissing their claims that FSI defamed the corporate defendants in the documents. Second, defendants contend that the district court erred by failing to submit those documents to the jury as additional instances of defamation against the individual defendants, which was equivalent to judgment as a matter of law for FSI on those issues. See Turlington v. Phillips Petroleum Co., 795 F.2d 434, 444 (5th Cir. 1986) ("The district court below failed to submit this issue to the jury, in effect granting [the opposing party] a directed verdict on that theory of recovery.").

The documents at issue are e-mails and letters sent by FSI employees or agents to various parties. Exhibit 34 is a February 2004 e-mail from Michael Roehrs accusing either his mother or

Daniel Roehrs of "supporting child molesters."  Exhibit 60, which is a January 2004 letter from the new FSI management team to business associates after the transition in power, notified the recipients of the change and asked for their assurance that they "will not manufacture any proprietary FSI parts or utilize FSI design features for any non-FSI personnel or former FSI employees."  The letter also asked the recipients to let FSI know immediately if contacted by former FSI employees.  Exhibit 61 is an October 2004 letter from FSI's attorneys to the Defense Supply Center in Columbus, Ohio (the "DSCC"), which said that "certain confidential and proprietary information and trade secrets . . . of FSI have been misappropriated and stolen by Applied Optical Systems."  The letter then asked that the DSCC "refrain from releasing any information submitted by AOS . . . in order to protect FSI's trade secrets and confidential proprietary information which have been wrongfully taken by certain individuals at AOS and unlawfully distributed."

In Exhibit 74, an October 2004 e-mail to officials of the DSCC, Michael Roehrs wrote that "The Minority Group (Now known as Applied Optical Systems and/or Optical Cabling Systems) have begun using our intellectual property and trade secrets and are entering the market."  The e-mail also stated that "they have provided stolen proprietary information to" the DSCC and that "they are using the government as a tool to launder our proprietary information and trade secrets."  Finally, Exhibits

27

90-92 were letters from FSI's lawyers to three companies stating that "FSI asserts and has reason to believe that these companies are in possession of and/or have acquired FSI's confidential proprietary and business information and trade secrets. FSI also believes that one or more of these companies are using, benefiting from, and/or disseminating FSI's confidential proprietary and business information and trade secrets."

The district court held that the documents were not capable of defamatory meaning because they did not "make[] any specific allegations that the entities stole FSI proprietary information or knew it to be stolen, or directly accuse[] the corporate defendants of wrongdoing." The court determined that only Exhibit 74 was even arguably defamatory, but that the e-mail "was intended to update the [DSCC] on a good-faith dispute between FSI and the corporate defendants about whether the information the corporate defendants were submitting was FSI proprietary information." Accordingly, the court determined that Exhibit 74 was mere "hyperbolic language" alerting the DSCC "that the information the corporate defendants submitted was the subject of litigation between the two parties and stat[ing] FSI's theory of the case, albeit in somewhat stronger terms than its pleadings."

As we discussed previously, the district court's role was to construe each statement in light of the surrounding circumstances to determine how the statement would be perceived by a person of ordinary intelligence. Gray, 941 S.W.2d at 329. If this inquiry

28

shows that a statement falsely and unambiguously imputes criminal conduct, it is defamatory per se. Gray, 941 S.W.2d at 329. If the statement is ambiguous or cannot be fully understood without the use of extrinsic evidence, the statement is not defamatory per se, and extrinsic evidence can be considered only under a defamation per quod theory. Moore, 166 S.W.3d at 386.

Here, the district court properly held that two of the documents were not capable of defamatory meaning towards the corporate defendants. Exhibit 34, in which Michael Roehrs accuses his mother or Daniel Roehrs of "supporting child molesters," does not mention the corporate defendants at all. Exhibit 60, in which FSI notified business associates of the change in management, contains no statements that could impute any crime, merely asking the recipients not to manufacture FSI parts or use FSI features for former employees.

However, Exhibits 61 and 74 are reasonably capable of defamatory meaning, and in some respects are almost identical to the defamatory statements that the district court ultimately submitted to the jury. Exhibit 61, sent by FSI's attorneys to the DSCC, stated that AOS "misappropriated and stole[]" FSI's trade secrets, and that FSI's trade secrets were "unlawfully distributed" by AOS to the DSCC. These statements plainly impute a crime, and their context, which encourages the letter's recipient to refrain from releasing information submitted to them by AOS, supports the defamatory nature of the statements.

29

Further, Exhibit 74, an e-mail from Michael Roehrs to the DSCC, accused AOS and OCS of "provid[ing] stolen proprietary information" to the DSCC, and stated that these acts were done to "launder [FSI's] proprietary information and trade secrets." Texas law criminalizes the knowing and unconsented "communicat[ion] or transmi[ssion of] a trade secret," TEX. PEN. CODE ANN. § 31.05(b), and despite the district court's belief that the e-mail was merely intended to update the DSCC as to the litigation at issue here, the statements alleging transmission of stolen trade secrets went beyond such a purpose.

Accordingly, the district court erred in granting summary judgment on the corporate defendants' defamation claims based on Exhibits 61 and 74. The allegedly defamatory statements in Exhibits 90-92 present a closer question, and the district court should reconsider its decision on those exhibits in light of this opinion.[13]

However, the district court properly refused to submit any of these documents to the jury as substantive evidence of defamation of the individual defendants. "For a defamatory statement to be actionable, it must refer to an ascertainable person." Robertson v. Sw. Bell Yellow Pages, Inc., 190 S.W.3d

---

[13] In its order on the summary judgment motions, the district court noted that the doctrine of absolute privilege "very likely applies to the attorney letters here," and that a fact issue remained as to whether the privilege was available for the e-mails sent by Michael Roehrs. This issue was not raised on appeal, and we express no opinion on the matter.

899, 902 (Tex. App.--Dallas 2006, no pet.). A person is ascertainable "if he is named in the statement or if those who know the person would understand that the statement was referring to the person." Ledig v. Duke Energy Corp., 193 S.W.3d 167, 180 (Tex. App.--Houston [1st Dist.] 2006, no pet.). Further, "a member of a group has no cause of action for a defamatory statement directed to some or less than all of the group when there is nothing to single out the plaintiff." Eskew v. Plantation Foods, Inc., 905 S.W.2d 461, 462 (Tex. App.--Waco 1995, no writ). Whether a party is ascertainable is a question of law for the court, but is submitted to the jury if the language is ambiguous or of doubtful import. Ledig, 193 S.W.3d at 180.

Defendants first argue that Exhibit 61 was directed not only at AOS, but the individual defendants as well. However, the language of the letter attributes criminal action to AOS, not to the individuals who work for AOS, and is incapable of defamatory meaning against the individual defendants. See Ledig, 193 S.W.3d at 180 (holding that statements about a company's actions did not defame a member of the company's senior management). The letter does refer to information "wrongfully taken by certain individuals at AOS," but nothing identifies any particular individual defendant.[14] Similarly, Exhibit 74 refers to "[t]he

_____

[14] The defendants argue that Michael Roehrs's testimony admits that the references to the corporate defendants in several

Minority Group (Now known as Applied Optical Systems and/or Optical Cabling Systems)" and alleges current criminal behavior. Although the letter references a past designation of the individuals as a group of minority owners in FSI, the context of the letter--which refers to that group's present status as AOS and OCS and alleges present crimes--shows that the crimes are only attributed to the named companies.  Further, Exhibits 90-92 make no reference at all to any of the individual defendants, mentioning only the acts of the corporate defendants.

Defendants also point to Exhibit 57, which alleges that "[c]ertain individuals have admitted under oath that they violated" the CFAA, but the exhibit does not identify any particular individuals.  Finally, Exhibit 34 may accuse Daniel Roehrs of "supporting child molesters," but defendants fail to identify any crime that such an allegation imputes.

**D.  FSI's Motion for a New Trial**

Accompanying FSI's post-verdict motion for judgment as a matter of law, the company moved in the alternative for a new trial.  In this appeal, FSI challenges the district court's denial of a new trial, alleging that the jury verdict contained inconsistent answers to the special interrogatories and that the jury finding on defamation was improperly influenced by the

---

of the documents were intended to encompass all defendants. However, the question is not whether the speaker intended to identify a person, but rather whether the words would be understood in such a way by those who know the person.

spillover prejudice of inadmissible evidence. "We review a district court's ruling on a motion for new trial for abuse of discretion." Int'l Ins. Co. v. RSR Corp., 426 F.3d 281, 300 (5th Cir. 2005). This court also gives "great deference to the district court ruling when it has denied the new trial motion and upheld the jury's verdict." Id.

## 1. Inconsistent Jury Findings

"If the jury gives inconsistent answers to special interrogatories, the case must be remanded for a new trial." Willard v. The John Hayward, 577 F.2d 1009, 1011 (5th Cir. 1978). In determining whether answers are inconsistent, we look to "whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." FDIC v. Fid. & Deposit Co., 45 F.3d 969, 977 (5th Cir. 1995) (citation omitted). A jury's answers "should be considered inconsistent, however, only if there is no way to reconcile them." Willard, 577 F.2d at 1011. This court makes "a concerted effort to reconcile apparent inconsistencies in answers to special verdicts if at all possible." Ellis v. Weasler Eng'g Inc., 258 F.3d 326, 343 (5th Cir. 2001).

FSI argues that two different jury findings contradict the jury determination that FSI falsely and maliciously accused defendants of being thieves. First, FSI contends that the jury finding that three of the defendants violated 18 U.S.C.

33

§ 1030(a)(4) is equivalent to a finding that those defendants were thieves. Second, FSI argues that the jury's determination that FSI filed the police report of computer theft without malice establishes that FSI's accusations that defendants stole the intellectual property on those computers were made without malice as well.

However, each of these findings can be reconciled. First, the finding that three defendants violated § 1030(a)(4) did not necessarily establish that the defendants were thieves. Section 1030(a)(4) deals with unlawful access of computer systems to further fraud. 18 U.S.C. § 1030(a)(4). Although the jury found that three defendants violated this section, and that their unlawful access caused a loss to FSI totaling $36,000, the determination did not require a finding that the defendants stole trade secrets or anything else. Section 1030(a)(4) does require a finding that the violator obtained something of value by means of the unlawful access, but the value need not be a trade secret or even something that was stolen. The jury could have found that the value obtained by defendants inhered in the temporary use or possession of computer hardware,[15] as FSI suggested in its

---

[15] Section 1030(a)(4) provides an exception where there is no liability if "the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." Here, the jury could have found an object of fraud beyond the use of the computer.

closing arguments,[16] or some other value that was obtained without theft.

Additionally, the finding that FSI did not act with actual malice in filing the police report of computer theft does not establish, as FSI claims, that the report of theft was true or that later statements were made without malice as well.  As the jury was instructed, "actual malice means that the party making the publication acted with actual knowledge that it was false or with reckless disregard of whether it was false or not."  Accordingly, the jury finding on the police report does not mean that the jury believed that the allegations of theft were actually true, but merely that FSI believed it was true to the extent necessary to avoid liability.  Further, the jury could have determined that FSI sincerely believed when the police report was filed that the defendants stole computer equipment, but recklessly disregarded the truth when FSI accused defendants of stealing the company's intellectual property in statements made two months later.  The statements are therefore easily reconcilable.

**2.  Spillover Prejudice**

---

[16]  On the element that the defendants "intended to obtain something of value," FSI's counsel argued in part that defendants "took hardware worth more than $5,000."  Although FSI was suggesting that defendants stole the hardware, the jury could have believed the three defendants' testimony that any hardware in their possession was intended to be, and was in fact, returned to FSI.

In United States v. Edwards, 303 F.3d 606, 639 (5th Cir. 2002), this court considered whether evidentiary "spillover from invalid claims can be a basis for granting a new trial." We stated that to make such a claim, a party must "[a]t a minimum . . . show that [it has] experienced some prejudice as a result of the joinder of invalid . . . claims, i.e., that otherwise inadmissible evidence was admitted to prove the invalid claims."[17] Id. at 640. FSI argues in this appeal that the jury's defamation findings were improperly prejudiced by other allegedly defamatory statements that were admitted by the district court and submitted to the jury even though the court held that they were nondefamatory as a matter of law. Defendants, in addition to arguing that the evidence was not prejudicial, contend that FSI did not properly preserve a spillover prejudice argument, only raising relevance objections to the evidence when introduced at trial.

Unlike Edwards and similar spillover prejudice cases from other circuits, this is not a situation where one of several claims was held invalid and the reviewing court must determine whether evidence properly admitted for the invalid claim had a prejudicial effect on the jury's determination of the other

---

[17] Noting that such an argument had never been addressed by this court, the Edwards court acknowledged only "that perhaps a grant of a new trial might be appropriate in some cases of 'retroactive misjoinder'" before rejecting the spillover argument.

claims.[18]  Rather, this appeal involves evidence that was
admitted by the district court, over FSI's objections, for the
valid defamation claims discussed in the previous section, and
there is no need to discuss cases that apply a standard prejudice
inquiry to unique procedural circumstances.[19]  The relatively
straightforward question here--preserved for appeal by FSI's
relevance objections--is whether the district court abused its
discretion in admitting the evidence as relevant.[20]  See United

_____

[18]  Cases in other circuits discussing "spillover prejudice"
have involved evidence that was properly admitted for a claim
that was later held to be invalid.  See, e.g., United States v.
Cross, 308 F.3d 308, 317 (3d Cir. 2002) ("[P]rejudicial spillover
may occur . . . [w]hen a defendant is convicted on two counts
involving different offenses at a single trial and an appellate
court reverses his conviction on one of them . . . ."); United
States v. Rooney, 37 F.3d 847, 855 (2d Cir. 1994) ("When an
appellate court reverses some but not all counts of a multicount
conviction, the court must determine if prejudicial spillover
from evidence introduced in support of the reversed count
requires the remaining convictions to be upset.").  This court in
Edwards similarly acknowledged that "spillover from invalid
claims" might be a viable basis for granting a new trial when
that spillover would be inadmissible to establish the remaining
claims and where prejudice exists.  Edwards, 303 F.3d at 641.

[19]  It is irrelevant whether, as FSI contends, the evidence
was also intended by defendants to serve as substantive evidence
of independent acts of defamation.  The record does not reflect
that the district court ever limited the jury's consideration of
the evidence to these independent acts, and the district court
confirmed in its denial of FSI's motion for a new trial that the
evidence was admitted as relevant to show malice for the three
allegedly defamatory statements submitted to the jury.

[20]  Under Federal Rule of Evidence 403, "evidence may be
excluded if its probative value is substantially outweighed by
the danger of unfair prejudice."  The district court has "broad
discretion to weigh the relevance, probative value, and prejudice
of the evidence in determining its admissibility under Rule 403,"
which will not be disturbed without abuse of discretion.  United

37

States v. Hicks, 389 F.3d 514, 522 (5th Cir. 2004). Even if the district court improperly admitted the evidence, we will not reverse if the error was harmless.[21]  Id.

The evidence at issue here consists of the same documents involved in defendants' cross-appeal. The district court determined in its order on the motion for a new trial that the statements in the e-mails and letters, "while perhaps not defamatory on their face, were relevant to the question of whether FSI defamed the defendants," specifically on the question of malice because "much of this evidence illustrated the

_____

States v. Allard, 464 F.3d 529, 534 (5th Cir. 2006). The only document that FSI objected to on this ground, as opposed to relevance, is Exhibit 34, the e-mail in which Michael Roehrs stated that Daniel Roehrs or his mother were "supporting child molesters." However, we find no reason to believe that the prejudice of this or any of the documents outweighed their probative nature with regard to actual malice.

[21]  This inquiry involves considerations similar to those that courts have undertaken in spillover prejudice cases. In Cross, for example, the Third Circuit first looked to "whether any of the evidence used to prove the reversed count would have been inadmissible to prove the remaining count." 308 F.3d at 317. If the evidence would have been admissible, there was no prejudice, and a new trial was not warranted. Id. at 318. If the evidence would not have been admissible, the court then determined whether the error was harmless or highly prejudicial. Id.; see also Edwards, 303 F.3d at 640 (recognizing that at a minimum, such a claim must establish that the evidence was inadmissible and prejudicial). In Rooney, the Second Circuit looked to several factors bearing on prejudice, including whether the evidence would tend to have affected the jury's decision, whether the evidence was admissible on the remaining count, whether the two counts were so dissimilar as to permit the inference that the jurors kept the evidence separate in their minds, and whether the admissible evidence on the remaining count was strong enough that the chance of spillover prejudice was minimized. 37 F.3d at 855-56.

38

circumstances surrounding the parties' dispute, as well as FSI's recklessness about the truth of its allegations."

FSI's sole argument against this holding is to suggest the unsupported proposition that nondefamatory statements cannot be probative of actual malice in a defamation per se case. However, this court has established that "a court or jury may infer actual malice from objective circumstantial evidence." Brown v. Petrolite Corp., 965 F.2d 38, 47 (5th Cir. 1992); see also Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S 657, 668 (1989); Zeranque v. TSP Newspapers, Inc., 814 F.2d 1066, 1070 (5th Cir. 1987). The evidence can show "negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." Brown, 965 F.2d at 47 (quoting Bose Corp. v. Consumers Union of United States, Inc., 692 F.3d 189, 196 (1st Cir. 1982)).

Accordingly, the district court did not abuse its discretion in admitting the statements at issue as evidence relevant to the malice inquiry.[22] All of the statements were consistent with defendants' malice argument that the defamation claims were part of "an unbelievable smear campaign" involving "a calculated and relentless attempt by [FSI] that will go to any lengths to

---

[22] This holding is unaffected by our determination for defendants' cross-appeal that the documents did not defame the individual defendants, as the documents remain relevant to determining FSI's motive and intent underlying the statements submitted for jury evaluation.

39

destroy [defendants] completely." Although not admitted as substantive evidence of defamation, the documents illustrated the circumstances in which the defamatory statements were made and the state of mind of the FSI employees who made them, and were thus relevant evidence from which actual malice could be inferred. Finally, the jury instructions limited the jury's purview to three specific statements, and there is little likelihood that the jury was confused by the additional evidence.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of FSI's motion for judgment as a matter of law and, in the alternative, for a new trial, as well as the district court's grant of judgment as a matter of law on defendants' claim that the individual defendants were defamed in e-mails and letters, REVERSE the district court's grant of partial summary judgment on defendants' defamation counterclaim with regard to the corporate defendants, VACATE the district court's entry of a take-nothing judgment on FSI's § 1030(a)(4) claim, and REMAND this case for entry of judgment on the jury's § 1030(a)(4) verdict and for further proceedings consistent with this opinion. Each party shall bear its own costs.

40